11-2763(L)
United States of America v. Cromitie (Williams)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

Heard: November 5, 2012          Decided: August 22, 2013

Docket Nos. 11-2763(L), 11-2884(con), 11-2900(con), 11-3785(con)

- - - - - - - - - - - - - - - - - - - - - - - - - - -
UNITED STATES of AMERICA,
      Appellee,

                v.

JAMES CROMITIE, AKA Abdul Rehman, AKA Abdul Rahman, DAVID WILLIAMS, AKA Daoud, AKA DL, ONTA WILLIAMS, AKA Hamza, LAGUERRE PAYEN, AKA Amin, AKA Almondo,
      Defendants-Appellants.
- - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: JACOBS, Chief Judge, and NEWMAN and RAGGI, <u>Circuit Judges</u>.

     Appeal from the July 8, 2011, judgments of the United States District Court for the Southern District of New York (Colleen McMahon, District Judge), sentencing four defendants to terms of 25 years after their convictions by a jury of a terrorism plot to launch missiles at military airplanes and bomb two synagogues.

     Appellants contend primarily that entrapment was established as a matter of law, that outrageous government conduct violated the Due Process Clause, and that the prosecution's knowing use

of perjured testimony violated the Due Process Clause. The Court unanimously rejects (1) the claims of David Williams, Onta Williams, and Laguerre Payen as to entrapment as a matter of law, (2) all defendants' claims of outrageous government conduct and knowing use of perjured testimony in violation of the Due Process Clause, and (3) all defendants' other claims; the Court, by a vote of two to one, rejects the claim of James Cromitie as to entrapment as a matter of law.

Affirmed. Chief Judge Jacobs concurs in part and dissents in part; he would uphold Cromitie's claim of entrapment as a matter of law and reject all of Cromitie's other claims and reject all claims of the other defendants.

> Adam S. Hickey, Asst. U.S. Atty., New York, NY (Preet Bharara, U.S. Atty., Patrick Ian McGinley, Jason P.W. Halperin, Iris Lan, Asst. U.S. Attys., New York, NY, on the brief), for Appellee.
>
> Clinton W. Calhoun, III, White Plains, NY (Calhoun & Lawrence, LLP, White Plains, NY, on the brief), for Appellant James Cromitie.
>
> Theodore S. Green, White Plains, NY (Green & Willstatter, White Plains, NY, on the brief), for Appellant David Williams.

David A. Lewis, Federal Defenders of New York, Inc. Appeals Bureau, New York, NY (Mark B. Gombiner, New York, NY, on the brief), for Appellant Onta Williams.

Sam Braverman, Bronx, NY (Jennifer B. Arlin, Bronx, NY, on the brief), for Appellant Laguerre Payen.

JON O. NEWMAN, <u>Circuit Judge</u>.

Table of Contents

Background ...................................................... 5

    The Charged Offenses ...................................... 5
    Facts of the Offenses ..................................... 6
    Defense Evidence ......................................... 18
    Verdicts and Sentencing ................................. 18


Discussion .................................................... 18

I. Entrapment ................................................ 19
    (A) Elements of Entrapment ............................. 19
        (1) Design ....................................... 23
        (2) Time of Predisposition ....................... 28
        (3) Type of Evidence Relevant to
            Predisposition ............................. 30
    (B) Entrapment as a Matter of Law ................... 33
        (1) Cromitie ..................................... 33
          (a) Inducement ........................... 33
          (b) Predisposition ........................ 38
        (2) David Williams, Onta Williams, and
          Payen ....................................... 47
          (a) Inducement ........................... 47
          (b) Predisposition ........................ 48
    (C) Jury Charge on Entrapment ....................... 50

II. Outrageous Government Conduct ........................ 53
    (A) Government's Role in Planning
        the Crimes ........................................ 56

(B) Exploiting Religious Views ...................... 57
(C) Exploiting Professed Love ....................... 59
(D) Monetary and Other Benefits ..................... 60
(E) Aggregation of Persuasion Techniques ........... 62

III. Prosecution's Knowing Use of Perjured Testimony .... 63
    (A) False Statements Unrelated to the
        $250,000 Offer ................................. 64
    (B) False Statements Concerning the $250,000 ....... 67
        (1) Falsity of the $250,000 Testimony ......... 67
        (2) The Prosecution's Knowledge of the
            Falsity ...................................... 68
        (3) The Prosecution's Imputed Knowledge ........ 70
        (4) Likelihood of Affecting the Jury ........... 71

IV. Other Claims ........................................ 72
    (A) Admission of Video Evidence ..................... 72
    (B) Vouching for Witness's Credibility .............. 72
    (C) Jury's Exposure to Extra-Record Evidence ........ 73
    (D) Sentencing ...................................... 75

Conclusion ............................................. 78

This is an appeal by four defendants convicted of planning and attempting to carry out domestic terrorism offenses involving a plot to launch missiles at an Air National Guard base at Stewart Airport in Newburgh, NY, and bomb two synagogues in the Bronx. The appeal primarily presents issues concerning the extent to which a government informant may lawfully urge the commission of crimes, issues framed as claims of entrapment as a matter of law and outrageous government conduct in violation of the Due Process Clause. The appeal also presents an issue concerning the falsity of portions of the informant's trial

testimony.  These issues arise on an appeal by defendants-appellants James Cromitie, David Williams, Onta Williams, and Laguerre Payen from the July 8, 2011, judgments of the District Court for the Southern District of New York (Colleen McMahon, District Judge).  We reject the defendants' claims of entrapment as a matter of law, outrageous government conduct in the instigation of the offenses, and knowing use of perjured testimony, as well as all other claims raised on appeal.  We therefore affirm.

Background

*The charged offenses.*  All the charged offenses resulted from an elaborate sting operation conducted by the FBI using an undercover informant.  An indictment filed in June 2009, charged the four defendants with eight offenses: Count One -- conspiracy to use weapons of mass destruction within the United States (18 U.S.C. § 2332a); Counts Two, Three, and Four -- attempt to use weapons of mass destruction near or at the Riverdale Temple, in the Bronx, the Riverdale Jewish Center (a synagogue) in the Bronx, and the New York Air National Guard Base at Newburgh, respectively (18 U.S.C. § 2332a); Count Five -- conspiracy to acquire and use anti-aircraft missiles (18 U.S.C. § 2332(g)); Count Six -- attempt to acquire and use anti-aircraft missiles

(18 U.S.C. § 2332(g)); Count Seven -- conspiracy to kill officers and employees of the United States (18 U.S.C. §§ 1114, 1117); Count Eight -- attempt to kill officers and employees of the United States (18 U.S.C. §§ 1114, 2).

*Facts of the offenses.* The facts are detailed in two comprehensive opinions of the District Court, denying the defendants' post-trial motions. *See United States v. Cromitie*, 781 F. Supp. 2d 211 (S.D.N.Y. 2011) ("*Cromitie I*"), and *United States v. Cromitie*, No. 09 Cr. 558(CM), 2011 WL 1842219 (S.D.N.Y. May 10, 2011) ("*Cromitie II*"). We assume familiarity with those opinions and recount at this point only the salient facts that the jury was entitled to find with respect to the defendants' criminal conduct. We set forth facts concerning the claims of entrapment as a matter of law, outrageous government conduct, and knowing use of perjured testimony in the discussion of those claims.

A government confidential informant, Shahed Hussain, conducted an undercover investigation for several months in 2008 and 2009. Hussain is a Pakistani national who was granted asylum by the United States in the mid-1990s based on his claim of political persecution in Pakistan. In 2003, Hussain was convicted of fraud based on his misconduct as a translator

-6-

working at the Motor Vehicles Bureau in Albany. To avoid being deported, Hussain agreed to cooperate with the Government's investigation of another individual. In the spring of 2007, Hussain became a paid informant of the FBI and started working in the lower Hudson Valley. As the District Court stated, Hussain's goal was to "locate disaffected Muslims who might be harboring terrorist designs on the United States." *Cromitie II*, 2011 WL 1842219, at *2.

By June 2008, Hussain had been attending services at a mosque in Newburgh at the direction of the FBI. During that time, the FBI provided a house for Hussain that contained concealed video and audio recording equipment. In addition, the FBI provided Hussain with recording devices for his person and his car. Hussain presented himself at the mosque as a wealthy Pakistani businessman with knowledge of Islamic teachings. During a period of several months, Hussain cultivated a friendship with Cromitie, who subsequently recruited the other three defendants.

Cromitie, 42 years old, was, in Judge McMahon's words, "an impoverished man," *Cromitie I*, 781 F. Supp. 2d at 226, who sustained himself by committing petty drug offenses for which he had repeatedly been caught and convicted. In addition, he worked

a night shift at a local Walmart store, earning less than $14,000 per year.

On June 13, 2008, Cromitie walked up to Hussain in the parking lot of the mosque.  Hussain testified that Cromitie, in an Arabic accent, introduced himself as Abdul Rahman, and claimed that his father was from Afghanistan.  After a short conversation, Hussain drove Cromitie home from the mosque.  On the way, Cromitie asked Hussain about violence in Afghanistan that had been reported recently on television.  When Hussain asked Cromitie if he would like to travel to Afghanistan, Cromitie responded by saying he would love to.  He then said, in the first indication of his proclivity to terrorism, that he wanted "to die like a shahid, a martyr"[1] and "go to paradise," Trial Transcript ("Trial Tr.") 681, and immediately thereafter said, "I want to do something to America." *Id.* at 682.  As he said these words, he pointed his right index finger in the air in a gesture Hussain testified is used by "somebody[] in radical Islam" to mean "taking an oath in front of Allah to do take part of [*sic*] crime or Jihad act they want to do." *Id.* at 682.  During

---

[1] Hussain testified that a "shahid" was  a "person who dies in Islam as a soldier in jihad or soldier in warfare." Trial Transcript 681.

that first encounter, Hussain told Cromitie that a lot of military planes flew from what was later identified as Stewart Airport to take arms and ammunition to Afghanistan and Iraq.

Hussain met with Cromitie three more times in the summer of 2008. Hussain testified that during these meetings Cromitie said that he hated Jews and Americans and that he would kill the President of the United States "700 times because he's an antichrist." *Id.* at 686. After learning of these remarks, the FBI instructed Hussain to tell Cromitie that he, Hussain, was a representative of a terrorist group in Pakistan, Jaish-e-Mohammed ("JeM"). On July 3, 2008, Hussain, following these instructions, Hussain told Cromitie he was flying to Pakistan to meet with JeM and asked Cromitie if he wanted to attend. Cromitie said he did and then volunteered that he wanted to join JeM.

Hussain recorded four conversations with Cromitie in the fall of 2008. In a conversation recorded on October 19, Cromitie said that American Muslims could do something similar to the attacks of September 11, 2001, stating:

> "If, if the Muslims was to want the United States down, believe me, we can do it. With the regular Muslims here, all somebody has to do is give a good *fatwa* to the brothers and let, make sure they understand. You, they taking down our Islamic countries. What do we do to make that stop? So, we start taking something down here. You understand what I'm saying?"

Joint Appendix ("JA") 2824.[2]  In a conversation recorded later that day, Cromitie said, "I have zero tolerance for people who disrespect Muslims." *Id.* at 2836.

In a conversation recorded on October 29, Cromitie said, "When the call come[s], I'm gonna go, '*Allahu akbar*,' and I'm gone.  There's nothing no one can do.  I'm gonna go all the way.  There's no, no turn back." *Id.* at 2903.  On November 14, Hussain told Cromitie that he could obtain guns and rockets.

In late November, Hussain drove Cromitie to a conference of the Muslim Alliance of North America in Philadelphia.  On November 28, during the ride to the conference, Cromitie, in a recorded conversation, boasted that he had stolen three guns from Walmart, two .25 automatics and a snub nose, and had "stashed" them.  Also during the ride, Cromitie indicated that he could put "a team together," *id.* at 3229, and said he was "gonna try to put a plan together," *id.* at 3240.  Earlier that day, Cromitie for the first time expressed interest in buying "stuff" from Hussain.  Hussain had previously told Cromitie that he could get "[a]ny

---

[2] Verbatim quotations from audio and videotaped recordings are cited to the Joint Appendix, and those from recorded telephone conversations are cited to the Government's Supplemental Appendix.  Transcripts of these recordings were introduced as trial exhibits but not read into the trial transcript.

stuff that you need," specifically guns and missiles. *Id.* at 3146.

On the second day of the conference, November 29, Cromitie's talk became more specific after Hussain asked Cromitie if his "team" had ever "thought about doing something here [in the United States]." *Id.* at 3285. Cromitie responded by saying that his team never considered doing that, but that he had and that he had "been wanting to do that since I was 7." *Id.* at 3286. Cromitie claimed that he had bombed a police station in the Bronx in 1994, *id.* at 3296, but wanted to do something "a little bigger," *id.* at 3304, because he had "to make some type of noise to let them know," *id.* at 3302.

Hussain asked Cromitie what targets he wanted to hit in the New York area, and Cromitie said that he wanted to "hit" the George Washington Bridge. *Id.* at 3294. When Hussain said that bridges are too hard to hit, Cromitie replied, "Hit some small spots . . . . This had to be a terrorist act." *Id.*

Later, while Hussain and Cromitie were watching television coverage of a terrorist attack in Mumbai and the funeral of a Jew who had been killed in that attack, Cromitie said:

> "Look at the Jewish guy. You're not smiling no more, you fucker. I hate those bastards. . . . I hate those motherfuckers. Those fucking Jewish bastards . . . .

-11-

I'd like to get one of those. I'd like to get a synagogue. Me. Yeah, personally."

*Id.* at 3316.

Hussain recorded conversations with Cromitie on three occasions in December 2008. On December 5, Cromitie, after quoting a "brother" saying, "'I think it's time we make jihad right here in America,'" *id.* at 3449, said, "I agree with the brother. . . . [I]t makes sense to me," *id.* at 3450. On December 17, when Hussain said, "Let's pick a target," Cromitie suggested "Stewart Airport." *Id.* at 3536.

On December 18, Hussain traveled to Pakistan and returned eight and one-half weeks later.

In a meeting with Cromitie on February 23, 2009, Hussain asked, "The synagogue, where is it in Bronx or in Brooklyn?" *Id.* at 3623. Cromitie replied, "[T]here's one in [t]he Bronx, I mean you got like, uh two or three of them in Brooklyn." *Id.* The next day, Hussain bought Cromitie a camera and drove him to Stewart Airport where they conducted surveillance. While there, Cromitie took photos. Cromitie was recorded stating, "Imagine if we hit all the planes in one spot." *Id.* at 3845. He also told Hussain he was going to speak to another man about being a lookout and would "talk to some of the guys" and tell them they would receive

$25,000 to "just look out." *Id.* at 3655.

Six weeks passed without any contact between Cromitie and Hussain. On April 5, 2009, Cromitie reached out to Hussain. In a recorded conversation, he told Hussain of his financial problems and said, "I have to try to make some money brother." *Id.* at 4486. Hussain responded, "I told you, I can make you 250,000 dollars, but you don't want it brother. What can I tell you?" *Id.* At this, Cromitie answered, "Okay, come see me brother. Come see me." *Id.* We discuss this conversation in detail below. *See* Part I(B)(1)(a).

On April 7, Hussain told Cromitie that JeM had already taken significant steps to support the operation, stating, "The missile was ready." *Id.* at 3698. Later in that conversation Cromitie said he would "take . . . down" "a whole synagogue of men." *Id.* at 3717. Cromitie and Hussain then discussed the need for lookouts.

On April 10, Hussain picked Cromitie up at Cromitie's house and was introduced to a man standing in front of the house. This man, known as "Daoud," was defendant David Williams. All three men drove to the Riverdale section of the Bronx, where Cromitie photographed the Riverdale Jewish Center and the Riverdale Temple. Later that day Cromitie took photographs of airplanes

at Stewart Airport.

On April 23, the three met again. Cromitie asked at what distance could an IED (improvised explosive device) be detonated. When Hussain said 100 miles and explained, "You can sit down here, and it blows up there," *id.* at 3846, Cromitie and David Williams celebrated by bumping fists. When Hussain said he would train Cromitie how to use a rocket launcher, David Williams said that he wanted to participate. The next day, the three drove to Stewart Airport. David Williams asked Cromitie for the camera and took surveillance pictures. Later, they discussed taking rooms at a nearby Marriott Hotel to hide out after the planned attacks. After Hussain outlined the attack plans, David Williams said the airport attack would be the "tricky one," compared to the synagogue attack, which would be "smooth" because the bombs would be detonated remotely from a hotel. *Id.* at 3914.

In less than a week, Cromitie and David Williams recruited defendants Onta Williams and Laguerre Payen. On April 25, in a recorded telephone call David Williams told Cromitie to call Hussain and "[t]ell him I got the other brother."[3] Govt. Supp. Appx. 512. By April 28, when all four defendants met with

_____

[3] This was most likely Onta Williams.

-14-

Hussain, Payen had been recruited. At this meeting, when Cromitie explained that "Yahudi" means "Jews," Payen said, "Yeah you told me that," JA 4079, which permitted the jury to infer that Cromitie had recruited Payen.

Bombing two synagogues and launching Stinger surface-to-air missiles at Stewart Airport was specifically discussed at this meeting. Payen asked how long every job would take; Hussain told him ten minutes. Cromitie suggested that all four defendants and Hussain identify themselves in phone calls by code names: "Charles" for Cromitie, "Manny" for David Williams, "Brooks" for Onta Williams, "Bond" for Payen, and "Tony" for Hussain. They also agreed on other code words: "eggs" for phones, "the pilon" for the Bronx, "beans" for rockets, "birds" for planes, and "[t]he trains are coming" for "the police are coming." *Id.* at 4090-91. Payen confirmed that all he had to say was that the trains are coming. Cromitie ended the meeting by saying, "This is going down in history." *Id*. at 4104.

Previously David Williams told Cromitie that he (David) wanted to be armed. On April 30, David Williams purchased a semi-automatic pistol. Two days before, Onta Williams had tried to purchase two guns. On May 1, Payen took Hussain to the apartment of a person Payen said was willing to sell guns, but

-15-

there was no response to a knock at the door.

Later on May 1, Hussain and all four defendants drove to Stewart Airport to conduct more surveillance. All agreed on the best spot from which to launch Stinger missiles. They also discussed the locations where Onta Williams and Payen would be stationed as lookouts. The whole group then drove to Hussain's house and discussed plans for the attack.

On May 6, Hussain drove Cromitie, David Williams, and Payen to a warehouse in Stamford, CT, where the FBI had stored three fake bombs and two fake Stinger missiles. Hussain instructed them how to launch the missiles and how to wire the detonating devices for the bombs. After one missile and the bombs were loaded into Hussain's car, the four drove to a storage facility in New Windsor, NY, where Hussain had rented storage lockers. Cromitie, David Williams, and Hussain unloaded the weapons and placed them in the lockers while Payen acted as a lookout. *Id.* at 927. The group then hugged each other and shouted, "Allahu akbar, God is great." *Id.* Later that night, Payen explained to Onta Williams how the missile operated. At a meeting on May 8, Cromitie told the other defendants that there were 25 thousand balls (ball bearings) in a bomb and that "once them balls go off, they go anywhere." *Id.* at 4281. At the end of this meeting, the

defendants agreed to carry out the attacks on May 20.

On May 13, all four defendants drove with Hussain to the Riverdale section of the Bronx to conduct surveillance, specifically of the Riverdale Jewish Center. The defendants got out of the car and walked around looking for security cameras on top of nearby buildings. On May 19, Hussain and the four defendants conducted a final surveillance of Stewart Airport, during which Onta Williams changed the locations of the lookouts for the Airport. The group returned to Hussain's house to review the plans, which were to pick up the bombs at the storage facility, drive to Riverdale to wire them, leave them in cars that the FBI had placed in front of the synagogues, drive back to Newburgh, retrieve the missiles, fire them at the military planes, and detonate the bombs using their cell phones.

On May 20, the four defendants drove with Hussain to the New Windsor storage facility, where they picked up the three bombs and drove to Riverdale. Acting according to their plan, they stopped near where the two cars had been parked by the FBI for the operation, a Pontiac directly in front of the Riverdale Temple and a Mazda directly in front of the Riverdale Jewish Center. Hussain let Onta Williams, David Williams, and Payen out to take up their positions as lookouts. Cromitie then placed one

of the fake bombs in the trunk of the Pontiac and two others on the back seat of the Mazda.  Moments later, FBI agents arrested all four defendants.

*Defense evidence.* Cromitie presented two witnesses.  The personnel manager of the Walmart store where Cromitie had worked testified that the store had stopped selling long guns before the time when Cromitie had told Hussain he had stolen guns for resale and that Cromitie stopped showing up for work in February 2009 and was subsequently fired.  A neighbor of Cromitie's testified that Cromitie had sold him the camera that Hussain had purchased and had given to Cromitie for surveillance.  The other defendants presented no evidence.

*Verdicts and sentencing.*  After eight days of deliberation, the jury found Cromitie and David Williams guilty on all counts and found Onta Williams and Payen guilty on all counts except Count Eight, which charged attempt to kill officers and employees of the United States.  The District Court sentenced each defendant to a 25-year mandatory minimum sentence.

Discussion

The defendants make three principal claims on appeal: (1) the evidence established entrapment as a matter of law; (2) the Government's conduct in persuading Cromitie and, through him, the

-18-

other defendants to participate in the plan was outrageous conduct in violation of the Due Process Clause; and (3) the prosecution knowingly presented false testimony of its undercover informant Hussain in violation of the Due Process Clause.

I. Entrapment

(A) Elements of Entrapment

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988); *see Sherman v. United States*, 356 U.S. 369, 376-78 (1958). "Predisposition, the principal element in the defense of entrapment, focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63 (citations and internal quotation marks omitted). "[T]he fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Jacobson v. United States*, 503 U.S. 540, 548 (1992) (internal quotation marks omitted). The defendant has the burden of showing inducement, *see United States v. Bala*, 236 F.3d 87, 94 (2d Cir. 2000); *United States v. Williams*, 23 F.3d 629, 635

-19-

(2d Cir. 1994), and, if inducement is shown, the prosecution has the burden of proving predisposition beyond a reasonable doubt, *see United States v. Al-Moayad*, 545 F.3d 139, 153 (2d Cir. 2008); *Bala*, 236 F.3d at 94.

Before 1932, government inducement sufficed to preclude a valid conviction on the ground of entrapment.[4] In that year, the Supreme Court's first decision on the entrapment defense, *Sorrells v. United States*, 287 U.S. 435 (1932), began the process of defining the circumstances under which government inducement alone would no longer establish the defense of entrapment. *Sorrells* focused the entrapment inquiry on a defendant's state of mind, rather than on only the government's inducement: "'When the criminal *design* originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor.'" *Id.* at 445 (emphasis added) (quoting *Newman v. United States*, 299 F. 128,

---

[4] *See United States v. Becker*, 62 F.2d 1007, 1008 (2d Cir. 1933); *Lucadamo v. United States*, 280 F. 653, 657-58 (2d Cir. 1922). The Supreme Court has noted that the first case to recognize this version of entrapment was *Woo Wai v. United States*, 223 F. 412 (9th Cir. 1915). *See United States v. Russell*, 411 U.S. 423, 428 n.5 (1973).

-20-

131 (4th Cir. 1924)).

The next year, Judge Learned Hand observed that the Supreme Court in *Sorrells* had not spelled out "precise limits" as to when government inducement alone would no longer suffice to preclude a valid conviction. *See United States v. Becker*, 62 F.2d 1007, 1008 (2d Cir. 1933). Filling the void, he postulated the three circumstances, any one of which would become the accepted means in this Circuit of establishing a defendant's predisposition: "an existing course of similar criminal conduct; the accused's already formed *design* to commit the crime or similar crimes; his willingness to do so, as evinced by ready complaisance."[5] *Id.*

---

[5] A troublesome aspect of two of the three means of proving predisposition, rarely if ever discussed in reported opinions, is the inevitable tension between upholding the entrapment defense when the defendant does not have in his mind a pre-existing design of criminal conduct and rejecting the defense when he makes a prompt response to a government invitation to commit a crime. When a government agent inquires whether a person is willing to commit a crime (and accompanies the inquiry with sufficient persuasion to constitute inducement), a prompt "yes" could be forthcoming either from a person who had long entertained the idea of committing the proposed or a similar crime and was only waiting for the opportunity to do so, or from a person who had never before in his life contemplated the proposed or a similar crime. The promptness of the "yes" does not distinguish between the mental states of these two people.

Why then do we permit a jury to reject the entrapment offense when a person promptly says "yes" to a government-suggested crime? Perhaps the answer is that we rely on the jury, as the conscience of the community, to convict those it believes,

-21-

(emphasis added).  Twenty years later, when Judge Hand endeavored to quote verbatim the *Becker* formulations, he changed "complaisance" to "compliance."[6] *See United States v. Sherman*, 200 F.2d 880, 882 (2d Cir. 1952).  Although the wording has slightly changed since *Sherman*, these three circumstances have remained in this Circuit the three ways available to the Government to prove a defendant's predisposition.[7]  *See United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011); *Al-Moayad*, 545 F.3d at 154; *United States v. Salerno*, 66 F.3d 544, 547 (2d

---

based on all the evidence, would (or at least are likely to) commit the crime if solicited by someone other than a government agent and acquit those it believes would not (or at least are not likely to) commit the crime if so solicited.  And, of course, as with all jury decisions (other than an acquittal), a court retains the authority to police the outer limits of the jury's role by ruling in an extreme case, like *Jacobson*, that entrapment has been established as a matter of law.

[6] Although both words signify agreement, they have slightly different meanings.  "Complaisance" usually means "ready disposition to please"; "compliance" usually means "yielding to pressure, demand, or coercion." *See* Webster's Third New International Dictionary (1993).

[7] Other circuits have identified additional factors that might be helpful in determining a defendant's predisposition. For example, the Seventh Circuit has added "the character or reputation of the defendant" and "the nature of the inducement or persuasion offered by the Government." *United States v. Navarro*, 737 F.2d 625, 635 (7th Cir. 1984); *see United States v. Gamache*, 156 F.3d 1, 9-10 (1st Cir. 1986) (multiple factors); United States v. Busby, 780 F.2d 804, 807 (9th Cir. 1986) (same).

Cir. 1995); *United States v. Harvey*, 991 F.2d 981, 992 (2d Cir. 1993).

There is normally little controversy as to what constitutes prior "similar criminal conduct." *See* Paul Marcus, *The Entrapment Defense* § 4.05I (4th ed. 2009). "Ready compliance" is usually indicated by the promptness of a defendant's agreement to commit an offense. *See Marcus*, *supra*, § 4.05G. Indeed, the Supreme Court has stated that if the defendant "had promptly availed himself of the criminal opportunity" presented by government agents, "it is unlikely that his entrapment defense would have warranted a jury instruction." *Jacobson*, 503 U.S. at 550. What is meant by a pre-existing "design" is more problematic. Because, as far as we have been able to determine, no decision of our Court has encountered a jury's rejection of an entrapment defense where the prosecution's claim of predisposition rests solely on the defendant's already formed "design," *i.e.*, without prior criminal conduct or prompt agreement to commit the offense, we consider the meaning of "design" in some detail.

(1) Design

The first federal decision to use "design" to refer to the pre-existing mental state that defeats an entrapment defense appears to be *Woo Wai v. United States*, 223 F. 412 (9th Cir.

1915), in 1915, which quoted the following passage from 12 Cyclopedia of Law and Procedure 160 (1901): "The fact that a detective or other person suspected that the defendant was about to commit a crime, and prepared for his detection, as a result of which he was entrapped in its commission, is no excuse, if the defendant alone conceived the original criminal *design*." *See Woo Wai*, 223 F. at 414 (emphasis added). *Newman*, 299 F. at 131, quoted the "design" phrasing from *Woo Wai*, and *Sorrells*, 257 U.S. at 445, quoted it from *Newman.*

Despite the repeated use of "design" to describe the second means of proving predisposition, *see Jacobson*, 503 U.S. at 548; *United States v. Russell*, 411 U.S. 423, 435-36 (1973); *Sherman*, 356 U.S. at 372,[8] no court has discussed the meaning of the word in the context of the entrapment defense.

In the context of predisposition, the word "design" is ambiguous.[9] It can comprehend a continuum of mental states from

---

[8] We recently said that to show entrapment as a matter of law, a defendant must prove that: "(1) the government originated the criminal design, (2) the government suggested the design to the defendant and induced him to adopt it, and (3) the defendant had no predisposition to engage in the criminal design prior to the government's inducement." *Al Kassar*, 660 F.3d at 119.

[9] The ambiguity is well illustrated by the differing interpretations of the word "design" in the majority and partially dissenting opinions in this case. The Supreme Court

-24-

a generalized idea of committing criminal activity, to an intent to commit a particular crime or crimes, to a precise plan for committing such a crime or crimes.  In ordinary discourse, saying that someone acted "by design" usually means with a far more generalized intent than the specific "design" of an architect. When Judge Hand repeated from *Becker* the three means of showing predisposition in our Court's first encounter with George Sherman,[10] he said:

> "As we understand the doctrine it comes to this: that it is a valid reply to the defence, if the prosecution can satisfy the jury that the accused was *ready and willing* to commit the offence charged, whenever the opportunity offered."

*Sherman*, 200 F.2d at 882 (emphasis added).

When used as one of the three means of showing predisposition, we think "design" must take its meaning from the context of the type of criminal activity comprising the specific

---

might usefully consider substituting a different word or phrase when it next discusses predisposition in the context of a claim of entrapment.

[10] On Sherman's first appeal, we reversed and ordered a new trial because of an error in the jury instructions. *See United States v. Sherman*, 200 F.2d at 883.  On Sherman's second appeal, after his conviction upon the retrial, we affirmed. *See United States v. Sherman*, 240 F.2d 949 (2d Cir. 1949).  The Supreme Court reversed. *See United States v. Sherman*, 356 U.S. 369 (1958).

offenses a defendant has committed. With respect to a category as varied as terrorist activity, the requisite design in the mind of a defendant may be broader than the design for other narrower forms of criminal activity. In view of the broad range of activities that can constitute terrorism, especially with respect to terrorist activities directed against the interests of the United States, the relevant prior design need be only a rather generalized idea or intent to inflict harm on such interests. A person with such an idea or intent can readily be found to be "ready and willing to commit the offence charged, whenever the opportunity offered."

Our dissenting colleague draws from Judge Hand's opinion in the first *Sherman* appeal a narrower view of "design" than the one we adopt. Chief Judge Jacobs quotes Judge Hand's statement that the proof of the defendant's predisposition "may be by evidence of . . . his preparation . . . ." __ F.3d at __, **[typescript at 3]** and contends that a design must be "a course of conduct . . . already so well advanced in the defendant's mind that one can be sure . . . it was not planted by an agent provocateur," *id.* at __ **[typescript at 5]** In identifying evidence that "may" show predisposition, we do not think Judge Hand was requiring evidence that the defendant had taken steps to prepare to commit the

-26-

charged offenses.  In the sentences immediately preceding the sentence with the word "preparation," Judge Hand stated, as we quoted above, that a valid defense is shown when the accused is "ready and willing to commit the offense" when the opportunity arises, and then significantly added:

> "In that event the inducement which brought about the actual offence was no more than one instance of *the kind of conduct in which the accused was prepared to engage*; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his preexisting *purpose*."

Sherman, 200 F.2d at 882 (emphases added).

The first emphasized words convey the thought that the second means of showing predisposition, *i.e.*, having the requisite "design," does not mean "prepared" in the sense of having taken specific preparatory steps to accomplish an offense, or, in Chief Judge Jacobs' words, a "well advanced" "course of conduct"; rather, as the second emphasized word makes clear, it means "prepared" in the sense of being ready to commit the offense once the opportunity is presented.  If the accused has a "preexisting purpose" to commit offenses such as, or similar to, the charged offenses, then he has the requisite preparedness. That is enough to have the requisite "design."

We doubt that the potential terrorists who are available to

-27-

be recruited by Al Qaeda or similar groups have already "formed" a "design" to bomb specific targets, as Chief Judge Jacobs narrowly defines those terms. Their predisposition is to have a state of mind that inclines them to inflict harm on the United States, be willing to die like a martyr, be receptive to a recruiter's presentation, whether over the course of a week or several months, of the specifics on an operational plan, and welcome an invitation to participate. The Air Force personnel at Stewart Airport and the congregants at two synagogues in the Bronx are fortunate that the person who first approached Cromitie and suggested an operational plan was only a Government agent.

We detail in Part I(B)(1)(b), below, the evidence that permitted the jury to find that Cromitie had the requisite "design." Before outlining that evidence, we first consider at what point predisposition must be shown and then consider what types of evidence are available to prove a pre-existing "design."

(2) Time of Predisposition

Before the Supreme Court's decision in *Jacobson*, the prevailing rule had been that predisposition must be shown to have existed prior to inducement by a government agent. *See United States v. Williams*, 547 F.3d 1187, 1198 (9th Cir. 2008); *United States v. Francis*, 131 F.3d 1452, 1456 (11th Cir. 1997);

-28-

*United States v. Rodriguez-Andrade*, 62 F.3d 948, 954-95 & n.4 (7th Cir. 1995); *United States v. Palow*, 777 F.2d 52, 55 (1st Cir. 1985); *see also United States v. Williams*, 705 F.2d 603, 618 n.9 (2d Cir. 1983) ("Simply cultivating the friendship of a target preparatory to presenting a criminal opportunity is not inducement to commit a crime").

However, in *Jacobson* the Court stated that the prosecution must prove that "the defendant was disposed to commit the criminal act prior to first being approached by government agents." 503 U.S. at 549. The Court's support for this new standard is curious. First, the Court cited *United States v. Whoie*, 925 F.2d 1481 (D.C. Cir. 1991). The District of Columbia Circuit there urged its district judges to follow the model instruction in the Second Circuit, which the Court correctly reported as stating that the prosecution's burden is to prove that the defendant was ready and willing "*before the inducement* to commit the crime." *Id.* at 1486 (emphasis added); *see* L. Hand, J. Siffert, W. Loughlin & S. Reiss, *Model Jury Instructions* No. 807, ¶ 8.07, at 8-30 (1990). Second, the Supreme Court added a footnote that relied on the fact that the Government had "conceded" that its evidence was probative "because it indicated petitioner's state of mind *prior* to the commencement of the

-29-

Government's investigation." *Jacobson*, 503 U.S. at 549 n.2 (emphasis in original).

Whether *Jacobson* should be understood as requiring predisposition prior to an agent's contact, as the text states, or prior to inducement or investigation, as the Court's cited authorities state, we feel obliged to apply the standard stated in the text, and consider Cromitie's state of mind prior to the first contact with Hussain.

(3) Type of Evidence Relevant to Predisposition

Obviously any relevant evidence of what a defendant says or does *before* "first being approached by Government agents," *Jacobson*, 503 U.S. at 549, is admissible. Not as clearly admissible is evidence of what a defendant says or does *after* inducement. Although as a general matter "a defendant's state of mind . . . can be inferred from his actions and statements," *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993), a broad application of that principle would undermine the entrapment defense by permitting any induced conduct to prove predisposition. To guard against that risk, the Supreme Court has required that conduct of a defendant, after contact by Government agents, offered to prove predisposition, must be "independent and not the product of the attention that the

-30-

Government had directed at [the defendant]." *Jacobson*, 503 U.S. at 550; *see United States v. Squillacote*, 221 F.3d 542, 565-66 (4th Cir. 2000) (Predisposition may be proved by evidence of "independently motivated behavior that occurs after government solicitation begins.").[11] Of course, what a defendant says after contacted by agents is generally admissible to prove predisposition because, although some post-contact *conduct* might be the product of inducement, it will be a rare situation where a defendant can plausibly claim that the inducement caused him to *say* something that evidenced predisposition.[12]  This reality

---

[11] The District Court charged the jury, "Although you may consider evidence relating to a defendant's conduct after he was first approached, you may do so only to the extent that it shows something about the defendant's state of mind before that point." Tr. 3488. This statement was too broad in that it did not limit consideration of post-contact conduct to "independently motivated behavior." *Squillacote*, 221 F.3d at 565.  However, there was no objection to the wording of this portion of the charge, although the defendants did object to the omission of language prohibiting consideration of all post-contact conduct.

Concerning the Court's statement of the entrapment standard, the opinion in *Cromitie II* contains a typographical error, 2011 WL 1842219, at *3.  The word "or" should be "only," as is evident from the language in *United States v. Myers*, 692 F.2d 823, 849 (2d Cir. 1982), which *Cromitie II* is quoting.

[12] Judge McMahon was understandably perplexed by the apparent tension between *Jacobson*'s implicit approval of the use of a defendant's post-contact conduct, as long as it is independent and not the product of Government attention to the defendant, and the following sentences in *United States v. Brand*, 467 F.3d 179,

informs our subsequent discussion of Cromitie's post-June 13

statements in assessing his predisposition.

In considering the defendants' entrapment defense, we first

discuss their claim of entrapment as a matter of law and then

_____

192 (2d Cir. 2006): "Brand is correct in pointing out that the government's reliance on certain evidence of acts that occurred *after* Brand's initial contact with government agents is misplaced. This evidence would not be probative of 'petitioner's state of mind prior to the commencement of the Government's investigation.'" (quoting *Jacobson*, 503 U.S. at 549 n.2 (internal quotation omits *Jacobson*'s emphasis of "prior")). *See Cromitie II*, 2011 WL 1842219, at *13-15.

She endeavored to reconcile the tension by pointing out that when courts consider whether predisposition is shown by a defendant's prompt response to the Government solicitation, they necessarily rely on post-contact conduct, from which she properly reasoned that the language of *Brand* was overly broad. *See id.* at *13. Indeed, she properly characterized the language as dictum, noting that in *Brand* the Government had produced (1) abundant pre-contact evidence about the defendant's state of mind before the first contact with the Government's agents and (2) sufficient evidence of an immediate response to the Government's solicitation such that later indication of such a response was unnecessary. *See id.*

To her well reasoned analysis, we add only that *Brand*'s quotation from *Jacobson* was somewhat extravagantly enlisted. The words "petitioner's state of mind prior to the Government's investigation" were not said to indicate that all post-contact conduct was inadmissible to prove predisposition; they were said to complete the thought that the Government's valid post-contact evidence "developed during the course of its investigation" was "probative because it indicated petitioner's state of mind *prior* to the commencement of the Government's investigation." *Jacobson*, 503 U.S. at 549 n.2 (emphasis in original).

their challenge to the jury charge on entrapment.

(B) Entrapment as a Matter of Law

The defendants presented their defense of entrapment to the jury through cross-examination and summations. By its verdicts of guilty, the jury rejected the defense. On appeal, the defendants contend that entrapment was established as a matter of law, a claim we understand to mean that on the facts of this case, no reasonable jury could find predisposition beyond a reasonable doubt. *See Jacobson*, 503 U.S. at 553 (entrapment as a matter of law found where "[r]ational jurors could not say beyond a reasonable doubt that petitioner possessed the requisite predisposition prior to the Government's investigation"). We consider this claim first as to Cromitie and then as to the other defendants.

(1) Cromitie

(a) *Inducement.* Because the conduct of government agents is the focus of the inducement component of the entrapment defense and is the entirety of a claim of outrageous government conduct, the factual predicates of the entrapment and the due process claims are somewhat related, although the applicable legal principles are distinct. In assessing the inducement component of Cromitie's entrapment claim, we will consider only the facts

-33-

sufficient to show inducement, leaving the additional details of the Government's alleged misconduct for assessment of the due process claim below. *See* Part II(A)-(E).

The Government initially opposes Cromitie's entrapment claim by contending that there was no inducement. In the Government's view, once Cromitie indicated in his first discussion with Hussain that he wanted to "do something to America" and thereafter evinced a willingness to act upon that desire, "[a]ny follow-up remarks by [Hussain] . . . lack the specificity to constitute 'soliciting, proposing, initiating, broaching or suggesting the commission of the offense.'" Br. for Government at 45 (quoting *United States v. Dunn*, 779 F.2d 157, 158 (2d Cir. 1985)). Although Hussain's efforts to persuade Cromitie do not lack specificity, the Government seems to be arguing that his efforts are not relevant to inducement because Cromitie had the requisite predisposition before their initial meeting on June 13, 2008. However, in this case, Cromitie's statements on that date arguably do not make it clear whether he then had the requisite predisposition. We therefore need to consider what he said and did thereafter, but, as we discuss below, *see* Part I(B)(1)(b), the only post-June 13 statements and actions that can be looked at to give meaning to Cromitie's June 13 statements are those

that are independent of any inducement.  Hussain's efforts to persuade Cromitie after June 13 are relevant to both inducement and the ultimate issue of predisposition.

In this case, Hussain's efforts to persuade Cromitie constituted inducement.  As the District Court – with the benefit of hearing the recorded evidence and seeing the trial witnesses – forcefully stated, "I believe beyond a shadow of a doubt that there would have been no crime here except the government instigated it, planned it, and brought it to fruition."[13] Sentencing Transcript 63.  The record fully supports this statement.  Hussain's efforts to persuade Cromitie to commit the charged offenses persisted throughout the eleven-month period from their initial meeting until the arrest.  In addition to proposing specifics of the planned attacks and supplying bombs

---

[13] Judge McMahon also said, "[A]fter reviewing the record yet again, I am left with the firm conviction that if the Government had simply kept an eye on Cromitie, and moved on to other investigations, nothing like the events of May 20, 2009 would ever have occurred." *Cromitie I*, 781 F. Supp. 2d at 226. Forceful as this observation is, we understand it to mean, in view of Judge McMahon's subsequent conclusion that the Government proved Cromitie's predisposition, that Cromitie *on his own* would not have planned and carried out an elaborate bombing attack. At sentencing, she explicitly described Cromitie as "one who was incapable of committing an act of terrorism on his own." Sent. Tr. 57.  These observations do not in any way preclude a predisposition to participate in terrorist activities if approached by a real terrorist recruiter.

and missiles, Hussain's inducements included offers of $250,000, a barber shop at a cost of $70,000, a BMW, and an all-expense-paid, two-week vacation to Puerto Rico for Cromitie and his family. One portion of Hussain's testimony, elicited on redirect examination, is revealing:

> Q. "[W]hat did the FBI tell you to do?"
>
> A. "The FBI . . . told me to go a little bit harder on him [Cromitie] and put some pressure on him, see where he comes out given the opportunity."

Trial Tr. 2488.

At trial, the Government disputed that Hussain had offered $250,000 to Cromitie. We set forth in detail at this point what the record reveals on this issue because whether Hussain offered Cromitie this amount of money is, or might be, pertinent to three of the defendants' claims: sufficient inducement to require the prosecution to prove predisposition, outrageous government conduct in violation of the Due Process Clause, *see* Part II, *infra*, and, because Hussain denied making the cash offer, the prosecution's knowing use of perjured testimony in violation of the Due Process Clause, *see* Part III, below.

A recorded conversation on April 5 contained the following:

Cromitie: "I have to try to make some money brother."

Hussain: "I told you, I can make you 250,000 dollars,

but you don't want it brother."

JA 4486. Hussain testified that he told Cromitie that "he'll get a lot of money." Trial Tr. 892. In a recorded phone call to Cromitie on May 1, Hussain said, "I'm going to Florida to pick up the, the money." JA 4497. Later that night, in a recorded phone call to Payen, Cromitie said, "The cash rolled in," *id.* at 4502, and in a recorded phone call to Onta Williams still later that night, said, "The cash came through," *id.* at 4504.

The Government's dispute as to whether Cromitie was offered $250,000 is based on Hussain's testimony, elicited by the prosecution, that "$250,000" was a code word for the cost of the "equipments." Trial Tr. 1036. On cross-examination, Hussain characterized "$250,000" as a code word for the cost of the entire operation. *Id.* at 1797, 1800-01. On summation, the Government argued to the jury that "evidence that you saw[] supports what [Hussain] told you, as crazy as it may sound."[14] *Id.* at 3185-86. Undermining Hussain's claim that "$250,000" was a code word, apart from the claim's inherent implausibility, are the facts that (1) Hussain never told Cromitie that $250,000 was a code word, a more-than-curious omission given that the two men

---

[14] We discuss this "evidence" at footnote 31.

agreed on numerous code words for things and people, even using "sun" to mean "mission," *id.* at 1880, (2) Hussain never told the FBI that he was using "$250,000" as a code word, and (3) Hussain admitted on direct examination that he told Cromitie "he'll get a lot of money." *Id.* at 892. The rule of appellate review after a conviction that the evidence is to be viewed in the light most favorable to the prosecution, *see United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008), does not require us to accept Hussain's code word claim where no reasonable juror could believe the claim was true. Judge McMahon found, in assessing Cromitie's outrageous government conduct due process claim (as to which she was the trier of fact) that Hussain "offered Cromitie as much as a quarter of a million dollars to participate in a mission. . . .[T]here can be absolutely no question that such an offer was made." *Cromitie I*, 781 F. Supp. 2d at 219. We see absolutely no basis for rejecting that finding.

(b) *Predisposition.* With respect to the three means of proving predisposition, it is clear that Cromitie had not engaged in a course of similar conduct prior to the Government's inducement, nor did he readily agree to committing the charged offenses. Thus, the issue becomes whether, prior to inducement, he had an "already formed *design* to commit the crime or similar

crimes." *Becker*, 62 F.2d at 1008 (emphasis added).

On the first day that Hussain met Cromitie, Hussain quotes Cromitie as saying, "I want to do something to America." Trial Tr. 682. The potentially ominous meaning of these words was considerably clarified by Cromitie's immediately preceding statement that he wanted "to die like a shahid, a martyr," *id.* at 681, and the fact that, as he said them, he pointed his right index finger in the air in a gesture Hussain testified is used "by somebody[] in radical Islam" to "mean[] taking an oath in front of Allah to do take part of [*sic*] crime or Jihad act they want to do." *Id.* at 2456. The jury was entitled to think that wanting to die like a martyr, coupled with wanting to do something to America, meant a willingness to be a suicide bomber, even though Cromitie never planned to sacrifice his own life.

Fully indicating that Cromitie's initial statements to Hussain revealed a pre-existing design to commit terrorist acts against the interests of the United States are these later statements (all words in quotation marks were recorded):

- As early as July 8, 2008, Cromitie told Hussain that he wanted to join JeM, which he believed was a terrorist organization in Pakistan.

- Cromitie expressed an interest in buying "stuff" from Hussain, who had previously told Cromitie that "stuff" included guns and missiles.

-39-

- When asked, "[H]ave you ever thought about doing something here?" Cromitie answered, "I have been wanting to do that since I was 7." JA 3285-86.

- Also on November 28, Cromitie told Hussain he wanted to do something "a little bigger" than the bombing of a police station, *id.* at 3304, which he claimed to have done.

- "I'd rather go in and bomb some place . . . ." *Id.* at 3302.

- "I would actually like to put a fucking bomb in the back of a cop car while he's sitting in the motherfucker and watch him just explode, I would be the most happiest person in the world." *Id.* at 3310.

- "I would like to hit the bridge [to New Jersey]." *Id.* at 3294.

- When Hussain said, "Let's pick a target," Cromitie suggested "Stewart Airport." *Id.* at 3536.

- "If survival for me is taking out one of these American planes or whatever, that's my fight." *Id.* at 3287.

- "I'd like to get a synagogue. Me. Yeah, personally." *Id.* at 3316.

- "I don't care if it's a whole synagogue of men." *Id.* at 3717.

- "So it doesn't matter to me what they do to me after I killed President Bush." *Id.* at 2995.

- "When the call come, I'm gonna go, '*Allahu akbar*,' and I'm gone. There's nothing no one can do. I'm gonna go all the way. There's no, no turn back." *Id.* at 2903.

- "I'm a soldier here, though, but not for America."

*Id.* at 3022.

Cromitie's recorded words explained his motives for what he wanted to do:

- "[T]hey taking down our Islamic countries.  What do we do to make that stop?  So, we start taking something down here." *Id.* at 2824.

- "They [air force planes] bringing 'em [troops] over there [Afghanistan] to do damage to us.  So, if they don't have the planes to carry 'em over there, you can't do too much damage." *Id.* at 3660.

Indeed, Cromitie's recorded words admitted his predisposition:

- "You [Hussain] already seen I had some issues with this world over here.  So, and you know I would do something to get back at them.  Yeah, I would.  So you already knew I was like that.  It wasn't you who was talking to me, I talked to you about it. When we first met in the parking lot, I talked to you about it." *Id.* at 3309.

- "[I]f I'm doing something, it's because I wanted to do that for so long, myself, because I know it a [*sic*] be right.  You understand?  So, you have nothing to say about that.  Before I met you, I already told you already." *Id.* at 3615.

- "So you have, you [Hussain] didn't cause anything. When on the day of judgment Allah wanna say, 'Ah, yes Maqsood,[15] you enticed Abdul Rahman[16] to do that.' No! I would be the truth on that day: No! You [Allah] gave

---

[15] "Maqsood" is one of the names Cromitie used to refer to Hussain.

[16] Cromitie's name in his terrorist role.

-41-

me my own will.  You [Allah] gave me my own mind setting, Allah.  I did that on my own." *Id.*

These recorded statements, all of which were independent of any inducement, gave indisputable meaning to Cromitie's initial ominous, though somewhat generalized, words about wanting to "do something to America" and "die like a shahid, a martyr."[17]  The later statements also gave the jury ample basis for believing Hussain when he testified about what Cromitie had said to him during their first unrecorded conversation.

Chief Judge Jacobs discounts the significance of some of these statements, contending that they were the result of "badgering" by Hussain.  *See* __ F.3d at __ **[typescript at 7]** We disagree.  Cromitie's statement that he wanted to join JeM was volunteered and preceded only by the question whether he wanted to attend a conference in Pakistan with JeM.  His statement that

_____

[17] Chief Judge Jacobs contends that Cromitie's statements made after inducement "might show predisposition, but only if they refer back to Cromitie's state of mind prior to inducement." __ F.3d at __, **[typescript at 6]** Although statements after contact with a government agent must be *probative* of the defendant's state of mind prior to such contact, *see Jacobson*, 503 U.S. 549, as Cromitie's statements were, there is no requirement that the statements "refer back" to prior state of mind.  As it happens, the first two of the three statements quoted above explicitly refer back the time when and before Cromitie met Hussain ("When we first met in the parking lot, I talked to you about it," and "Before I met you, I already told you already.").

he wanted to bomb the George Washington Bridge was preceded only by the question "[W]hat, I mean, in your mind, were your best targets here? In New York?" JA 3292. Cromitie's identification of Stewart Airport was preceded only by Hussain's saying, "Let's pick a target." *Id.* at 3536. Cromitie's statement that he wanted to bomb a synagogue was volunteered, without any prior question, while watching a television report of a bombing in Mumbai. We see no badgering eliciting these revealing statements. Nor do we agree that these and the other statements set out above fail to reveal Cromitie's state of mind prior to the first meeting with Hussain in June 2008. On the contrary, they make entirely clear what Cromitie had in mind when he told Hussain at that first meeting that he wanted to "do something to America."

Chief Judge Jacobs also discounts Cromitie's statement that he wanted "to die like a martyr" as "boastful piety." __ F.3d at __ **typescript at 8]** We see nothing pious in wanting "to die like a martyr" when said in the same breath with wanting "to do something to America," especially when the statement is followed in a month with a volunteered desire to join what Cromitie believed was a Pakistani terrorist organization.

It is true that during the many months of Hussain's persuasion, Cromitie's commitment to the terrorism plot was not

-43-

unwavering.  For example, a recorded conversation on December 10 included the following:

> Cromitie: "I'm gonna try one more move, Hak[18].  If the move don't work, it doesn't matter, I'm gonna leave it. Is that okay with you?" JA 3525.

> Hussain: "That's perfectly fine, brother." *Id.*

But moments later, Cromitie said:

> "'Cause some things just don't work out.  But let me try something else.  I got something else planned. There's always a plan 'B.'  You understand? There's always a plan 'B.'  So don't worry.  Just be easy. Okay?" *Id.*

> After Hussain returned from a two-month trip to Pakistan, in a recorded conversation on February 23, 2009, this colloquy occurred:

> Hussain: "You talked about synagogues, remember?"

> Cromitie: "Yeah."

> Hussain: "You still wanna do it?"

> Cromitie: "I'm thinking about it.  I have to think about it.  I got so much, you know what, it's not that I don't wanna do it.  It's just that, since you been gone, I been, like, okay I guess everything's down the drain now."

> . . . .

> Hussain: "[T]here's some things that you were supposed to do while I was gone."

---

[18] Another name Cromitie used to refer to Hussain.

-44-

Cromitie: "I just dropped everything."

*Id.* at 3595-96. But Cromitie then continued:

> "I didn't forget everything, though. I remember
> everything. I remember the codes, the words,
> whatever. . . . I think I need to, I wanna do it.
> Because everything I been watching I been wanting to do
> everything. Ever since you been gone."

*Id.* at 3596.

On February 24, Cromitie told Hussain that he would be going
to North Carolina, a trip he apparently did not make. There was
no contact between them for the next six weeks despite Hussain's
efforts to reach Cromitie by phone. Then on April 5, Cromitie
resumed contact by phoning Hussain. This was the call in which
Hussain offered Cromitie $250,000. Cromitie asked for a
meeting. When they met on April 7, Hussain pressed Cromitie as
to where he stood:

> "So you have to tell, you have to tell me yeah. Can we
> do it, or can we not do it?" *Id.* at 3716.

Cromitie initially replied, "I'm thinking," and then, warming to
the plan, said:

> "I'm gonna tell you I don't care if it's a whole
> synagogue full of men. . . . I would take 'em down, I
> don't even care. 'Cause I know they are the ones. . . .
> [S]ee, I'm not worried about nothing. Ya know? What
> I'm worried about is my safety."

*Id.* at 3717. Continuing with their plans, they discussed

lookouts.  On April 10, Hussain and Cromitie picked up David Williams and conducted surveillance of the synagogues.  From that point on, events moved rapidly to the May 20 finale.

Despite moments of wavering, which do not preclude a finding of predisposition, *see United States v. Davila-Nieves*, 670 F.3d 1, 4 (1st Cir. 2012) (predisposition despite seven-month interval between informant's contacts with defendant); *United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991) ("second thoughts following initial enthusiasm do not establish entrapment"), Cromitie revealed his willingness, indeed his eagerness, to commit acts of terrorism through his own recorded statements. Two examples stand out.  Referring to the initial conversation with Hussain, Cromitie recalled in a recorded conversation, "[Y]ou already knew I was like that.  It wasn't you who was talking to me, I talked to you about it.  When we first met in the parking lot, I talked to you about it." JA 3309.  And contemplating that "on the day of judgment" Allah would say that Hussain had enticed him, Cromitie said he would answer, "No! You [Allah] gave me my own will. . . . I did that on my own." *Id.* at 3615.

From everything that Cromitie said, the jury was entitled to find that he had a pre-existing "design" and hence a

-46-

predisposition to inflict serious harm on interests of the United States, even though Government officers afforded him the opportunity and the pseudo weapons for striking at specific targets. "[T]he fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Jacobson*, 503 U.S. at 548 (internal quotation marks omitted). "It is sufficient if the defendant is of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion." *Williams*, 705 F.2d at 618.

(2) David Williams, Onta Williams, and Payen

(a) *Inducement.* We will assume for the argument that the Government's inducement of Cromitie, some of which was undoubtedly relayed by him to the other three defendants, sufficed to show that they too were induced. *See United States v. Pilarinos*, 864 F.2d 253, 256 (2d Cir. 1988) ("derivative entrapment defense available 'where government agents act through private citizens'") (quoting *United States v. Buie*, 407 F.2d 905, 908 (2d Cir. 1969), *aff'd without consideration of this point sub nom. Minor v. United Sates*, 396 U.S. 87 (1969)); *United States*

-47-

*v. Valencia*, 645 F.2d 1158, 1168-69 (2d Cir. 1980) (government inducement via third party), *amended*, 669 F.2d 37 (2d Cir. 1981), *aff'd after remand*, 677 F.2d 191 (2d Cir. 1982).  We note that only Cromitie was offered $250,000; the other defendants were each offered $5,000. Trial Tr. 1035.

(b) *Predisposition.*  The Government does not contend that the predisposition of David Williams, Onta Williams, and Payen was shown by prior similar conduct or a pre-existing design.  Instead, the Government contends that their predisposition, sufficient to defeat an entrapment defense, is shown by their "'ready response to [any] inducement.'" Br. for Government at 46 (quoting *Al-Moayad*, 545 F.3d at 154). *See United States v. Viviano*, 437 F.2d 295, 299 (2d Cir. 1971) (Predisposition may be shown by "a willingness to commit the crime for which [the defendant] is charged as evidenced by [his] ready response to the inducement.").

The District Court acknowledged that there was "no direct evidence of when or how these [three] defendants were solicited." *Cromitie II*, 2011 WL 1842219, at *15.  Nevertheless, after a meticulous review of the evidence, *see id.* at *16-23, Judge McMahon concluded that circumstantial evidence of what the three defendants said and did shortly after they had been recruited

-48-

sufficed to permit the jury to find a "ready response" that defeated their entrapment defense, *see id.* at \*23. As she noted, "[N]o more than a few days[] passed" between the time that Cromitie first talked to David Williams and the time when David Williams "showed himself to be fully committed" to the plan, *id.* at \*19, and "Onta Williams and Payen agreed to become involved 'promptly' after they were first approached" and "were willing to join in a terrorism plot without any hesitation or reservation," *id.* at \*22. We fully agree with her analysis and conclusions.[19]

Although all three defendants were recruited just to be lookouts, they not only agreed to the entire plan promptly but expressed enthusiasm for it. Among their statements, most of which were recorded, are these:

> - David Williams: "The ones that should be hit is the ones that's the cargo planes." JA 3853. "[The attacks would] be a hell of a story though. Tell your grandkids." JA 4267.

> - Onta Williams: "[Blowing up the planes is] gonna be

---

[19] Judge McMahon was careful to note that her analysis depended on a reading of *Brand* that permits post-inducement conduct to prove the "ready response" that defeats entrapment. *See Cromitie II*, 2011 WL 1842219, at \*23. We agree that *Brand* does so. What we question in *Brand* is only the dictum that some post-inducement conduct is not also relevant to prove a defendant's pre-existing design. *See* footnote 12, *supra.*

-49-

a double whammy." *Id.* at 4275.  "So if we kill them here, it would all be equal [to U.S. military operations abroad]." Trial Tr. 2528.

- Payen: (responding to Hussain's caution that the plot was "secret") "*Insha' Allah.*  I know what time it is.  There's a lot of things I've done in my lifetime, Hakim.[20]" JA 4117. "I'm doing this for the sake of Allah." *Id.* at 4314.

Although, as Judge McMahon stated, "It is beyond question that the Government created the crime here," *Cromitie II*, 2011 WL 1842219, at *23, the evidence sufficed to permit the jury to find predisposition and reject the entrapment defense.  That defense was not established as a matter of law.

(C) Jury Charge on Entrapment

The defendants challenge the jury charge on entrapment on the ground that the charge did not instruct the jury in accordance with the Seventh Circuit's decision in *United States v. Hollingsworth*, 27 F.3d 1196 (7th Cir. 1994) (in banc).  In that decision, a closely divided (6-5) in banc court ruled that an entrapment defense succeeds as a matter of law unless a defendant, whom government agents have induced to commit an offense, is "in a position without the government's help to become involved in illegal activity." *Id.* at 1200.  As then-Chief

---

[20] "Hakim" was another name the defendants called Hussain.

Judge Posner contended, predisposition "has positional as well as dispositional force." *Id*. He amplified this "positional" view of predisposition as follows: "The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime[,] some criminal would have done so . . . ." *Id*. He offered as examples a public official in a position to accept a bribe, a drug addict to sell drugs, and a gun dealer to make illegal gun sales. Urging us to adopt the Seventh Circuit's view, the defendants argue that none of them was in a position to acquire Stinger missiles or bombs to carry out the proposed attacks.

We reject the Seventh Circuit's expansion of the entrapment defense to permit an induced defendant, predisposed under existing standards to commit a crime, to establish the defense of entrapment simply because, prior to the unfolding of a government sting, he was not in a position where it was likely that he would have figured out how to commit the offense and how to acquire necessary devices. The principal dissent in *Hollingsworth* has forcefully set forth the shortcomings of this ill-advised expansion, *see* 27 F.3d at 1213 (Ripple J., with whom

-51-

Bauer, Coffey, Kanne, and (in part) Easterbrook join,[21] dissenting),[22] and the Ninth Circuit has rejected it, *see United States v. Thickstun*, 110 F.3d 1394, 1398 (9th Cir. 1997). A person who has a pre-existing design to commit terrorist acts against United States interests or who promptly agrees to play a part in such activity should not escape punishment just because he was not in a position to obtain Stinger missiles and launch them at United States airplanes. The Government need not leave him at large until a real terrorist suggests such action and

---

[21] Judge Easterbrook concurred fully in the portions of Judge Ripple's dissent rejecting the "positional" approach to predisposition. He concurred partially only to disagree with Judge Ripple on an unrelated point.

[22] To their dissenting opinions, we add only that the "positional" test does not explain why a prompt "yes" to a solicitation to commit a crime is indicative of a pre-existing interest in committing a crime depending on the defendant's position. In the several Abscam cases in which convictions were affirmed by this Court, *see United States v. Silvestri*, 719 F.2d 577 (2d Cir. 1983); *United States v. Murphy*, 715 F.2d 39 (2d Cir. 1983); *United States v. Thompson*, 710 F.2d 915 (2d Cir. 1983); *Williams*, 705 F.2d 603; *United States v. Myers*, 692 F.2d 823 (2d Cir. 1982), the prompt agreement by a Senator and many Representatives to accept a bribe after it was offered told us only that they were willing to commit the crime of bribery, but it left us unenlightened as to whether they had entertained the thought of accepting a bribe *before* one was offered or simply jumped at the first opportunity. Nor did their position as members of Congress answer that question. What their positions provided was the ability to take the actions (introduce bills) for which the bribes were offered, not an indication that doing so was previously in their minds.

supplies real missiles.

The defendants' challenge to the jury charge is rejected.

II. Outrageous Government Conduct

As a claim distinct from their claim of entrapment as a matter of law, the defendants contend that their convictions should be reversed because the Government's conduct in persuading Cromitie, and the others through Cromitie, to commit the charged offenses was so outrageous as to violate the Due Process Clause. In *Hampton v. United States*, 425 U.S. 484 (1976), the Supreme Court, by a vote of 5 to 3, ruled that, even as to a defendant predisposed to commit an offense, outrageous government conduct could invalidate a conviction.[23]  The conduct of the law

---

[23] *See Hampton*, 425 U.S. at 492-93 (Powell, J., with whom Blackmun, J., joins, concurring in the judgment); *id.* at 497 (Brennan, J., with whom Stewart and Marshall, JJ., join, dissenting).  Justice Stevens did not participate. *See id.* at 491.

Criticizing the three-member plurality (Rehnquist, J., with whom Burger, C.J., and White, J., join, 425 U.S. at 485-91), Justice Powell wrote: "The plurality thus says that the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of surrounding circumstances.  I do not understand *Russell*[, 411 U.S. 423 (1973),] or earlier cases delineating the predisposition-focused defense of entrapment to have gone so far . . . ." *Hampton*, 425 U.S. at 492-93 (footnote omitted).

Justice Brennan wrote: "The focus of the view espoused by

-53-

enforcement officials must reach a "demonstrable level of outrageousness before it could bar conviction." *Id.* at 495 n.7 (Powell, J., concurring in the judgment). We have recognized the same principle. "Government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." *Al Kassar*, 660 F.3d at 121. We also recognized this possibility in *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999), although cautioning that the alleged misconduct must "shock the conscience" in the sense contemplated by *Rochin v. California*, 342 U.S. 165, 172 (1952) (forced stomach pumping). *See also United States v. Myers*, 692 F.2d 823, 836 (2d Cir. 1982) ("Unlike the entrapment defense, which focuses on the defendant's predisposition, th[e] due process claim focuses on the conduct of the government agents."). Only a divided panel

Mr. Justice Roberts [in *Sorrells*, 287 U.S. at 453], Mr. Justice Frankfurter [in *Sherman*, 356 U.S. at 378], and my Brother Stewart [in *Russell*, 411 U.S. at 439] is not on the propensities and predisposition of a specific defendant, but on whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power. . . . Under this approach, the determination of the lawfulness of the Government's conduct must be made as it is on all questions involving the legality of law enforcement methods by the trial judge, not the jury." *Hampton*, 425 U.S. at 496-97 (internal quotation marks omitted) (ellipsis in original).

of the Third Circuit has ruled that government conduct violated due process limits, *see United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978),[24] and that Circuit has since ruled that the rationale of *Twigg* had been limited by *Hampton*. *See United States v. Beverly*, 723 F.2d 11, 12 (3d Cir. 1983).

Courts acknowledging the possibility of dismissal for outrageous government conduct have said little about what conduct would be considered constitutionally "outrageous." Indeed, this Court has said that this type of claim is "an issue frequently raised that seldom succeeds." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997). In *Al Kassar*, we said, "Generally, to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person." 660 F.3d at 121. We have also stated:

> "[W]hether investigative conduct violates a defendant's right to due process cannot depend on the degree to which the government action was responsible for inducing the defendant to break the law. Rather, the existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience' regardless of the extent to which it led the defendant to commit his

---

[24] Cromitie argues that the outrageous conduct claim was also upheld in *United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984), *see* Br. for Cromitie at 46 n.9, but that decision reversed a conviction after ruling that entrapment was established as a matter of law, *see Lard*, 734 F.3d at 1294.

crime."

*United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (citation omitted). The D.C. Circuit has said that due process limits are violated only where government misconduct includes "coercion, violence or brutality to the person." *United States v. Kelly*, 707 F.2d 1460, 1476 (D.C. Cir. 1983) (internal quotation marks omitted).

As to what does *not* exceed due process limits, we have said, "It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive. . . . [F]eigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct." *Al Kassar*, 660 F.3d at 121.

In asserting their claim of outrageous conduct, all four defendants focus on the Government's role in the planning of, and preparing for, the aborted attacks; Cromitie cites in addition Hussain's suggesting that he had a religious obligation to commit the crimes, exploiting professed love for Hussain, and offering him large financial benefits.

(A) Government's Role in Planning the Crimes

There is no doubt that Government agents planned the entire

-56-

operation with respect to launching missiles to destroy airplanes at Stewart Airport. The idea of bombing synagogues appears to have originated with Cromitie, although Government agents supplied the fake bombs and instructed the defendants how to detonate them. In Judge McMahon's words, "The Government invented all of the details of the scheme . . . ." *Cromitie I*, 781 F. Supp. 2d at 220.

But as with all sting operations, government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits. *See Russell*, 411 U.S. at 431-32; *Rahman*, 189 F.3d at 131. Once the FBI learned that Cromitie, in his very first encounter with Hussain, had expressed a desire to "do something to America" and had given an ominous meaning to this statement by saying he wanted to die like a martyr, the FBI agents would have been derelict in their duties if they did not test how far Cromitie would go to carry out his desires. Determining whether Cromitie would go so far as to launch missiles at military aircraft was not outrageous government conduct.

(B) Exploiting Religious Views

Cromitie amplifies the outrageous conduct claim by arguing

that Hussain "engaged in proselytizing [him] to convert him from a moderate if angry, Muslim, to one committed to violent terrorism in the name of religion."[25] Br. for Onta Williams at 62-63. As Cromitie explained to the other defendants at a meeting a few days before the planned attacks, Hussain had told him, "[D]on't do it just for the money. But do it . . . in the name of Allah." JA 4159.

It is an unfortunate aspect of the modern world of Islam that within the ranks of the hundreds of millions of law-abiding Muslims exists a small number of jihadists who have the distorted view that acts of violence serve Allah. When a government agent encounters a Muslim who volunteers that he wants to "do something to America" and "die like a shahid," the agent is entitled to probe the attitudes of that person to learn whether his religious views have impelled him toward the violent brand of radical Islam that poses a dire threat to the United States. Such probing does not remotely implicate the religion clauses of the First Amendment, as Cromitie argues, *see* Br. for Onta Williams at 64-65, nor constitute outrageous government conduct.

---

[25] These words appear in the brief for Onta Williams at 62-63; Cromitie has adopted all of his co-defendants' arguments. *See* Br. for Cromitie at 3.

(C) Exploiting Professed Love

Cromitie further argues that Hussain exploited Cromitie's professed love for Hussain by reciprocating with expressions of feigned love, thereby using their relationship to manipulate Cromitie into agreeing to the planned attacks. *See* Br. for Onta Williams at 68-72. On numerous occasions Cromitie told Hussain, "I love you brother," *e.g.*, JA 2809, 3095, 3153, and Hussain often replied, "I love you too, brother." *e.g. id.* at 2809, 3095, 3153. On at least one occasion, Hussain flirted with Cromitie: "Tell me how much you love me." *Id.* at 3192.

Cromitie argues that Hussain's exploitation of their relationship is outrageous conduct on a par with the sexual intercourse that a government agent allegedly engaged in to seduce a suspect, conduct that our Court has indicated might, depending on the circumstances, violate due process limitations. *See United States v. Cuervelo*, 949 F.2d 559, 567-69 (2d Cir. 1991). We disagree. Although we need not determine where the outer limits of permissible sexual involvement with a suspect might be, we fully agree with the Ninth Circuit that the "illusory cultivation of emotional intimacy" does not exceed due process limits. *United States v. Simpson*, 813 F.2d 1462, 1467 (9th Cir. 1987). "To win a suspect's confidence, an informant

-59-

must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the suspect." *Id.* at 1466.

(D) Monetary and Other Benefits

Finally, Cromitie argues that the monetary and other benefits Hussain offered him were so large as to exceed due process limits on government conduct. The principal benefit, as we have discussed above, *see* Part I(B)(1)(a), was a cash offer of $250,000, and in addition a barbershop, a new BMW, and a two-week vacation.

Our Court has not encountered a government-offered cash inducement as large as $250,000. The Abscam cases in this Circuit involved bribe payments of $50,000, and we found no due process violation. *See*, *e.g.*, *Myers*, 692 F.2d at 827.[26] In *Al Kassar*, we ruled that a cash inducement of €125,000 did not constitute outrageous conduct. *See* 660 F.3d at 116, 121. The D.C. Circuit has ruled in another Abscam case that an offer of $100,000 to a congressman did not violate due process, *see United*

---

[26] In *Myers*, the inducement also included offering to bring multi-million dollar projects to districts of members of Congress. We ruled that such offers did not violate due process limits because it is a "normal part of [the members'] public responsibilities to promote business activity for the benefit of their constituents." 692 F.2d at 838.

*States v. Jenrette*, 744 F.2d 817, 823-24 (D.C. Cir. 1984), and the Ninth Circuit has ruled that a finder's fee of $200,000 to a potential supplier of large quantities of cocaine did not cross the due process line, *see United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987).[27]

Even if we were to accept the premise that an offer of money might, in some unlikely circumstances, be so large as to constitute outrageous government conduct, we do not believe a line should be drawn at a fixed dollar amount. Such an absolute line would be inconsistent with the flexible standards usually informing due process limitations. *See Morrisey v. Brewer*, 408 U.S. 471, 481 (1972). An amount of money that might constitute a due process violation should be measured in relation to the inducement available for a particular criminal act from non-governmental sources and the nature of the act itself. A large sum reflecting the going rate for a murder-for-hire might exceed due process limits if offered to induce the sale of a small quantity of marijuana.

[27] In *Williams*, the Ninth Circuit, considering a defendant's claim that the Government had offered him hundreds of thousands to perhaps more than a million dollars in potential cocaine sales, assumed that such an offer constituted inducement, but had no occasion to assess the offer against due process limitations. 547 F.3d at 1198.

With respect to the outrageous government conduct claim, the burden of proof rested with the defendants, and they presented no evidence to indicate that $250,000 (plus assorted other benefits) was more than might plausibly be required to purchase the services of a person willing to recruit and lead a team to launch Stinger missiles at an air force base and bomb synagogues. Whatever the going rate for such terrorist activities, only an offer significantly higher would require us to consider whether due process limits had been exceeded. The monetary benefits offered to Cromitie did not violate the Due Process Clause.

(E) Aggregation of Persuasion Techniques

Although Judge McMahon candidly acknowledged that she was "not familiar with a case in which so many different tactics were used on a single individual," she concluded that "Cromitie justified the Government's persistence when he proved to be ready and willing to commit terrorist acts. . . . [T]here was no coercion of any sort, no suggestion of duress and no physical deprivation." *Cromitie I*, 781 F. Supp. 2d at 223. We agree. None of the techniques Hussain used to persuade Cromitie or the other defendants to participate in the government-devised plan, whether considered in isolation or cumulatively, violated the Due

-62-

Process Clause.

III. Prosecution's Knowing Use of Perjured Testimony

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted); *see Giglio v. United States*, 405 U.S. 150, 153 (1972); *Drake v. Portuondo*, 553 F.3d 230, 240 (2d Cir. 2009); *Perkins v. LeFevre* 642 F.2d 37, 40 (2d Cir. 1981).

"In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at [the] time of trial; and (iv) the perjured testimony remained undisclosed during trial." *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (internal quotation marks and alterations omitted).

The perjury is "material" if there is any "reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, and the prosecutor's knowing use of perjured testimony can violate the

Due Process Clause even if it only undermines a witness's credibility, *see Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) ("A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and [to] elicit the truth.").

The defendants mount a vigorous attack on Hussain's credibility, claiming that he had told numerous lies prior to the trial, he testified falsely during the trial, and such falsity was known or should have been known to the prosecution. This claim arises in a context quite different from that of most of the relevant cases. Typically the fact that the prosecution was aware of a witness's trial perjury comes to light only after the trial. That was the situation, for example, in *Wallach*, where the prosecution became aware of the perjury of its principal witness six months after the trial, *see United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). In the pending case, however, the evidence that Hussain had lied was presented to the jury during the trial. We consider first the false statements unrelated to the $250,000 offer and then the $250,000 testimony itself.

(A) False Statements Unrelated to the $250,000 Offer

Most of Hussain's lies unrelated to the $250,000 offer were told years before the trial. They occurred in various contexts: his asylum application,[28] his financial statement in connection with the presentence report in Albany for his prior conviction,[29] his statements in a bankruptcy proceeding,[30] and his statements

---

[28] Hussain falsely said on his asylum application that Pakistani police and army officials had given him permission to leave the country, *see* JA 1006-07; claimed he had been arrested in Pakistan for many crimes, but in fact the arrest was for kidnapping, *see id.* at 2330-31; and made what he called "a mistake" in denying on an application for citizenship that he had never committed any crimes for which he had not been arrested, *see id.* at 2290-92.

[29] Hussain falsely told the Probation Department that he owned six restaurants when in fact his family owned them, *see* JA 1047-48, and that his house was worth $160,000, although it was assessed five months later for $125,000, *see id.* at 1050-51; he did not list loans on his financial affidavit prepared for his presentence report, *see id.* at 2309, and he lied about the scope of his fraud violation, *see id.* at 2278.

[30] Hussain did not tell the bankruptcy court about the receipt of trust funds from Pakistan, *see* JA 1258-60, and omitted from his bankruptcy petition three cars that he owned and $100,000 of family business stock, *see* JA 1128.

Hussain also omitted mention of a prior arrest when he applied for a liquor license; *see* JA 1099-1100, misled a school district as to where he lived; *see id.* at 1284, admitted that a judgment was entered against him for fraudulent misrepresentations with respect to a hotel he owned; *see id.* at 1269, and admitted that he wrote a false name for his father, *see id.* at 2154, and for his own place of birth when he applied for a passport in Montreal, *see id.*, but claimed he did this to avoid detection by terrorists, *see id.* at 2404.

in a job application, among others.

Hussain's lies at trial, with the exception of his denial of the $250,000 offer and his code word claim, also concerned events occurring long before the sting operation. He testified that in the Albany criminal case he had met his lawyer for the first time at sentencing and had met him only once, *see* Trial Tr. 1265-66, but one of the defense counsel in the pending case reported that the Albany lawyer told him he had met with Hussain many times starting two years before sentencing, *see id.* at 1910.

Hussain testified about his receipt of funds from a family trust in Pakistan. This testimony, if not false, was certainly inconsistent. There is no doubt that he received large sums of money from Pakistan, but it is not clear whether these were loans or trust income to which he was entitled. At one point he claimed that all of the money was a loan from the trust that had to be returned. *See id.* at 2349-50, 2854.

Hussain testified that he paid taxes on the $50,000 he earned as an informant, *see id.* at 1633, but also admitted that he did not pay taxes on this money, *see id.* at 2936.

Hussain testified that someone other than himself wrote the word "died" on his asylum application (referring to his mother), but in later testimony admitted that he did write the word

"died." *See id.* at 2953-54.

None of Hussain's lies before trial or in his trial testimony, except for those concerning the $250,000 offer to Cromitie, related to the defendants' offense conduct. Furthermore, they had only minimal relevance to Hussain's credibility in recounting the defendants' offense conduct in view of his admission of almost all of them in his trial testimony and the fact that the principal evidence of such conduct was the recorded words of the defendants themselves. There is thus no "reasonable likelihood" that these lies "could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, to the defendants' detriment.

(B) False Statements Concerning the $250,000

The defendants' claim that Hussain testified falsely concerning the $250,000 offer presents more substantial issues. These are whether the testimony was false, whether the prosecution knew of the falsity, whether the prosecution should have known of the falsity, and whether there was any reasonable likelihood that the false testimony would have affected the jury.

(1) Falsity of the $250,000 Testimony

As we have recounted, Hussain testified that he did not offer Cromitie $250,000 and that "$250,000" was a code word for

-67-

the cost of the mission. Trial Tr. 1797, 1800-01. His denial of the offer was shown to be false by the April 5 recorded telephone call in which he responded to Cromitie's expressed need for money by explicitly stating, "I can make you 250,000 dollars." JA 4486. In addition, Hussain admitted that he told Cromitie that he would "get a lot of money." Trial Tr. 892. The falsity of the code word claim, apart from its inherent implausibility, was shown by the facts that Hussain never told Cromitie that "$250,000" was a code word, he testified that he "thought Cromitie would understand," he never told the FBI that he was using "$250,000" as a code word, he admitted that "$250,000" did not appear on his list of code words, and he admitted that the list did contain "sun" as a code word for "mission." *Id.* at 1880.

These facts clearly showed that Hussain's testimony was false.

(2) The Prosecution's Knowledge of the Falsity

The Government has maintained that the prosecution did not believe Cromitie was lying. On rebuttal summation, the prosecutor flatly declared, "There is no evidence that [Hussain] offered anything more than $5,000," *id.* at 3337, and on summation, the prosecutor urged the jury to believe that "$250,000" was a code word, *id.* at 3185. Although conceding that

"anybody looking at those words [from the April 5 recorded phone call] on the page would know that Cromitie, easily, could have took [*sic*] that as an offer for $250,000," the prosecutor continued, "[b]ut the evidence, other evidence that you saw, supports what [Hussain] told you, as crazy as it may sound."[31] *Id.* In its appellate brief, the Government recounts Hussain's claim that "$250,000" was a code word for the operation, *see* Br. for United States at 89, and asserts that "the Government . . . 'formed a good-faith belief that the [alleged lies] referr[ed] only to . . . inconsistencies . . . that were aired at trial,'" *id.* at 107 (quoting *Morris*, 447 F.3d at 744).[32]

Although given some pause by the prosecutor's jury argument in support of the code word claim, we cannot say that the prosecution knew the claim was false. The prosecutor might have

---

[31] The "evidence" the prosecutor then outlined was: (1) the $250,000 was never mentioned again, (2) the fact that Cromitie resumed contact with Hussain after the six-week absence and then heard the $250,000 figure shows that Cromitie could not have anticipated such an offer, and (3) Cromitie had finally found his lieutenant. *See* Trial Tr. 3186. The first item casts at least some doubt about a bona fide offer; the other two prove nothing.

[32] In redirect examination of Hussain, the prosecutor asked questions that could be interpreted to indicate skepticism about the code word claim. The prosecutor asked, "How is that possibly a code?" and had Hussain concede that "$250,000" was not on a list of code words. Trial Tr. 2513-14.

subjectively believed that the code word claim was true, even though in the District Court's view, and in ours, there was not a reasonable basis for such a belief. We note that Hussain's testimony about the $250,000 was not the sort of assertion that could be verified by investigation.[33] *Cf. Wallach*, 935 F.2d at 456 (witness's denial of gambling refuted by third-party observations). Most important, the District Court, as the trier of fact for the due process claims, made no finding that the prosecutor knew that Hussain's code word testimony was false. On the contrary, the Court stated, "The Government . . . 'formed a good-faith belief that the [alleged lies] referr[ed] only to the already-known inconsistencies in [the witness's] testimony that were aired at trial.'" *Cromitie II*, 2011 WL 1842219, at *26 (quoting *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006)) (brackets in *Cromitie II*).

(3) The Prosecution's Imputed Knowledge

---

[33] In discussing with counsel Hussain's apparently false testimony about matters other than the $250,000 offer, the District Court warned the prosecution that it acted at "its peril" if it failed to observe its obligations. Trial Tr. 2019. With respect to Hussain's false testimony about the $250,000, there is no reason to believe the prosecution could have determined from third parties whether the testimony was false, and the examination of Hussain on this topic, both by the prosecution and the defense, thoroughly probed his claim that the offer was made and that "$250,000" was a code word.

-70-

The evidence undermining Hussain's testimony about the $250,000 was not only clear enough to show its falsity; it was so forceful that no reasonable person could fail to recognize its falsity. As Judge McMahon found, "[T]here can be absolutely no question that [the $250,000] offer was made." *Cromitie I*, 781 F. Supp. 2d at 219. Thus, even if the prosecution in good faith subjectively believed that Hussain's testimony about the $250,000 was true, the prosecution "should have known," *Josephberg*, 562 F.3d at 494, that it was false.

(4) Likelihood of Affecting the Jury

The very force of the evidence that shows that no reasonable person could believe Hussain's testimony about the $250,000, is sufficient not only to charge the prosecution with imputed knowledge, but also to show that the jury had to recognize that the testimony was false. Furthermore, the jury heard Hussain admit that he gave Cromitie the "impression" that he would "make a lot of money." Trial Tr. 1869. There is thus no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. Indeed, we see no likelihood at all.

The defendants' claim of knowing use of perjured testimony, though substantial, does not warrant reversal.

-71-

IV. Other Claims

The defendants' remaining claims do not require extended discussion. They challenge (1) the admission of video evidence, (2) the prosecutor's alleged vouching for Hussain's credibility, (3) the denial of a mistrial because the jury saw two portions of recorded statements that were not in evidence, and (4) the imposition of mandatory minimum sentences.

(A) Admission of Video Evidence

The defendants argue that the District Court abused its discretion by admitting a 20-second video of a demonstration explosion set off by a bomb placed on the back seat of a car and constructed with the type and amount of material that the defendants thought was in the fake devices they were planning to use in the operation. Br. for David Williams at 37. The Government introduced the video to establish that the fake bombs, if real, would have qualified as "destructive devices" under 18 U.S.C. § 2332(c)(2)(A) and 18 U.S.C. § 921(a)(4). The evidence was plainly relevant and not unfairly prejudicial, *see* Fed. R. Evid. 403, and its admission was well within the District Court's discretion.

(B) Vouching for Witness's Credibility

The defendants argue that the prosecutor improperly vouched

for Hussain's credibility by pointing out in his closing summation that Hussain had a reason to be truthful because he knew that he faced possible deportation if he committed perjury. Because no defendant objected at trial, we review this claim only for plain error.

Although a prosecutor should not vouch for a witness's truthfulness, *see United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005), it is not improper to point to evidence indicating a witness's awareness of a particular adverse consequence of testifying falsely, beyond the risk of perjury applicable to all witnesses. *See*, *e.g.*, *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1147 (2d Cir. 1978) (lying risked loss of sentence reduction in cooperation agreement). Hussain had testified that he feared he would be deported if he was convicted of perjury, and the prosecutor was entitled to remind the jury of that testimony.

(C) Jury's Exposure to Extra-Record Evidence

The defendants argue that their rights were violated because the jury briefly had access to transcripts of two recorded phone conversations that had not been admitted in evidence. The jurors had binders that included transcripts of conversations that they were instructed to use as aids when listening to recordings

admitted into evidence.  The transcript of a phone call between defendant David Williams and his father ("David Williams transcript") was inadvertently included in one juror's binder although the recording of that call was not in evidence.  The transcript of a phone call between defendant Onta Williams and a female friend ("Onta Williams transcript") was inadvertently included in each juror's binder although the recording of that call was not in evidence.  David Williams was recorded telling his father that his entrapment defense was "dead" because he had agreed to participate in the operation the first time it was proposed to him. *See* JA 4516.  Onta Williams was recorded saying that he was offered $10,000 to participate in the operation. *See* JA 4512-13.

After the jury discovered and informed the District Court that these transcripts were included in its binders, the District Court questioned each of the jurors to determine the extent of their exposure to the transcripts and whether they could continue to deliberate without considering this extra-record information. All of the jurors except the juror whose binder contained the David Williams transcript statement agreed, and that juror was excused.

Based on the remaining jurors' responses, Judge McMahon

-74-

concluded that none of them had reached the page of the David Williams transcript on which the "dead" remark appeared, the Onta Williams transcript was actually favorable to the defense (as contradicting Hussain's testimony that he had offered only $5,000), and the jurors' ability to disregard the episode and decide the case fairly was entirely credible. The District Court gave an emphatic curative instruction.

After carefully reviewing all of the circumstances, the District Court, correctly applying applicable standards, denied the defendants' motion for a mistrial. We see no basis for disturbing that ruling.

(D) Sentencing

The defendants argue that their 25-year mandatory minimum sentences are invalid because of sentencing entrapment or sentencing manipulation. Specifically, they point out that their mandatory minimum sentences resulted from convictions on Counts 5 and 6, punishing conspiring and attempting, respectively, to acquire and use anti-aircraft missiles (18 U.S.C. § 2332g), and that the idea of planning the use of such missiles originated with the Government. Indeed, although the District Court rejected the defendants' sentencing argument, *see United States v. Cromitie*, No. 09 Cr. 558(CM), 2011 WL 2693297, at *4 (S.D.N.Y.

June 29, 2011) ("*Cromitie III*"), the Court found that the Government created the fake Stinger missiles "for the sole purpose" of subjecting the defendants to 25-year mandatory minimum sentences, *id.* at *2.

Sentencing entrapment, a concept we have said has not yet been recognized in this Circuit, *see United States v. Gomez*, 103 F.3d 249, 256 (2d Cir. 1997), would, if applicable, preclude a sentence where "outrageous official conduct" has "overcome[] the [defendant's] will," *id.* (internal quotation marks omitted). The District Court ruled there was no basis for such a finding in this case, *see Cromitie III,* 2011 WL 2693297*,* at *1. We agree.

Sentencing manipulation, which we have also not yet recognized, *see United States v. Gagliardi*, 506 F.3d 140, 148 (2d Cir. 2007), would, if applicable, require a showing of "outrageous" misconduct, *see Bala*, 236 F.3d at 93.

The Government urged the District Court to reject the claim of sentencing manipulation by analogy to narcotics cases in which undercover agents frequently probe what quantities of drugs a suspect will sell, an inquiry that can expose the suspect to a range of increasing sentences based on drug quantities. *See* United States Sentencing Guidelines § 2D1.1(c). The District Court rejected the Government's analogy to narcotics cases

because, unlike the defendants in this case, the suspects in those cases had previously been identified as participants in the type of criminal conduct with which they were charged. *See Cromitie III,* 2011 WL 2693297, at *3. Whether or not the analogy applies to all sentencings, we deem it applicable in this case where the principal defendant expressed early on an inclination to commit acts of terrorism and his co-defendants promptly and enthusiastically joined the plot with full awareness that it included launching anti-aircraft missiles. The Government did nothing improper by testing to see just how far these defendants would go in committing acts of terrorism.

We note that the District Judge determined that, even if the missiles had not been part of the plot, the terrorist activities directed at the Riverdale synagogues would have authorized a life sentence under the advisory Sentencing Guidelines, *see id.* at *2, and, as she told Cromitie at sentencing, she would have "no mind to sentence you to less than 25 years." JA 2713.

Ultimately, the District Court concluded that it lacked authority to sentence below the statutory 25-year mandatory minimum. *See id.* at *5. Whether or not that is so, there was no error in imposing mandatory minimum sentences in this case.

-77-

Conclusion

Judge McMahon skillfully conducted a difficult trial, dealing meticulously in several carefully written opinions with issues that arose in extraordinary circumstances. The resulting judgments of convictions and sentences of all four defendants are affirmed.

DENNIS JACOBS, <u>Chief Judge</u>, concurring in part and dissenting in part:

I concur as to the affirmance of the convictions of David Williams, Onta Williams, and Laguerre Payen, and I concur in the majority's rejection of any argument premised on outrageous government misconduct, and its rejection of other defense arguments. I respectfully dissent in part because James Cromitie was entrapped as a matter of law.

**I**

As to entrapment, it is common ground on this panel that the government induced Cromitie to commit the terrorist crimes charged, and that it became the government's burden to prove beyond a reasonable doubt that Cromitie was "predisposed" to commit them. <u>See</u> <u>United States v. Bala</u>, 236 F.3d 87, 94 (2d Cir. 2000) ("[If] a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt."). The government had to do that by proving any of three things: "(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a

willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." United States v. Brunshtein, 344 F.3d 91, 101-02 (2d Cir. 2003) (internal quotation marks and alteration omitted). Since Cromitie had no similar criminal background, and since the government informant enlisted him only after a dogged and year-long campaign of nagging, pursuit, and temptation (with money, a business, and a Mercedes-Benz), this panel is in agreement that the government had to prove an "already formed design."

In my view, there was no evidence of an "already formed design." At the outset, Cromitie told of wanting to "do something to America" and "die like a martyr," but this big talk does not amount to a design--to *do* what?--never mind one that was "already formed." The design here was entirely formed by the government, and fed to Cromitie. He liked it, but he didn't form it.

**II**

The term "already formed design" is defined away by the majority: it is "only a rather generalized idea or intent to inflict harm on" the interests of the United States. Maj. Op. at 25. That definition of the term is more its converse

because an idea or intent does not amount to a design, and one that is "generalized" is unformed; the "generalized idea" of an act is not a disposition to do it; and entrapment is the very process of mobilizing a generalized idea that otherwise would remain an idle thought. Thus the majority opinion renders entrapment untenable as a defense. Unsurprisingly, the majority's definition is incompatible with precedent.

"Formed design" is one of the three ways that the government may prove predisposition, as set out in United States v. Becker, 62 F.2d 1007, 1008 (2d Cir. 1933) (Hand, J.): "an existing course of similar criminal conduct; the accused's already formed design to commit the crime or similar crimes; [and] his willingness to do so, as evidenced by ready complaisance." Id. at 1008. The same short catalog was repeated in somewhat different words in United States v. Sherman, 200 F.2d 880, 882 (2d Cir. 1952) (Hand, J.): "The proof of [predisposition] may be by evidence of his past offences, of his *preparation*, even of his ready compliance."[1] Id. (emphasis added) (internal quotation

---

[1] As the majority points out, Sherman used the word "prepared" as well as the word "preparation"; the majority argues that (given the common root of the words) Judge Hand meant "prepared" in the same sense as he meant "preparation" a few lines later. The two words are used in different senses, to suit distinct contexts. The first, as the

3

marks omitted).  So an "already formed design" is one sufficiently advanced that (before government solicitation) the defendant had already "prepar[ed]" to do the crime. Entertaining a "generalized idea" of a crime is several critical steps removed from preparing to commit it.  A design that is "already formed" has taken shape, and assumed parameters even if particulars remain open.  A design already formed is not (as here) inchoate, undirected, and open to suggestion and revision in every respect.

The term "already formed design" takes meaning from its company, appearing in a series of three related ways to show predisposition: commission of the offense in the past, the ready willingness to do it then and there, or a formed design, which looks to the future.  Existence of a formed design matters only if it cannot be shown that the defendant had already done analogous acts or had given ready assent. The three can operate as alternatives only if they are understood to be of comparable predictive force.  There is

_____

majority explains, conveys "the sense of being ready to commit the offense once the opportunity is presented," Maj. Op. 26-27, which bears on whether Cromitie was "ready and willing"; but *proof* of being "ready and willing" requires a showing (beyond a reasonable doubt) of similar prior acts, quick acceptance, or "preparation" in the sense of an "already formed design."  The majority opinion thus conflates predisposition ("ready and willing") with a way of proving predisposition (an "already formed design").

great predictive force in a showing of past criminal acts along the same lines. Similarly, a ready acceptance bespeaks a complete absence of qualm or inhibition, and likewise shows that the defendant's will and disposition did not run counter to the act and did not need to be overcome.

The predictive force of a formed design is sufficient on its own only if a course of conduct is already so well advanced in the defendant's mind that one can be sure (beyond a reasonable doubt) it was not planted by an agent provocateur. Perhaps this is why we have never before found sufficient evidence to prove that the accused had an already formed design without there also being sufficient evidence of a relevant criminal history or of ready assent to the government's proposal. Cf., e.g., United States v. Valencia, 645 F.2d 1158, 1167 (2d Cir. 1980) ("All of this evidence [of the defendants' prior criminal conduct] could support a jury finding either that the [defendants] had been engaged in a similar 'course of criminal conduct,' or had already formed the design to sell cocaine and were merely looking for a buyer.").

It therefore is not enough to infer a formed design to commit an act of terror from a sense of grievance or an impulse to lash out. These disquiets are common, and in most people will never combust.

## III

With this in mind, there is scarce evidence of any "already formed design" on the part of Cromitie.  As the majority opinion explains, evidence of predisposition must be independent of the government's inducement.  See Jacobson v. United States, 503 U.S. 540, 550 (1992).  Cromitie's statements at his initial meeting with Hussain therefore would be probative only if they showed Cromitie's thinking prior to inducement.  And I agree that Jacobson allows consideration of certain acts or statements that *follow* government inducement.  See United States v. Brand, 467 F.3d 179, 192 (2d Cir. 2006).  Thus statements that Cromitie made long after the inducement process began might show predisposition, but only if they refer back to Cromitie's state of mind prior to inducement or if they tend to show that Cromitie came up with the criminal design on his own.  Cromitie's statement that he had been thinking about attacking America "since [he] was [seven]" is a backward-looking statement, but it is well short of a formed design, and shows only that any such ideation was permanently postponed.[2]  Likewise, Cromitie's statement that he was the one who first approached Hussain the day they met also

---

[2]     When I was seven, I wanted to be a fireman.

6

refers back to Cromitie's state of mind prior to the inducement.  But it proves nothing about any "design" Cromitie might have had; it might perhaps bear on whether there was inducement, except that it is common ground that inducement was offered.

The majority opinion relies heavily and <u>passim</u> on post-inducement acts and statements that do not reflect the defendant's state of mind *before* the initial inducement, and therefore do not bear on predisposition.  <u>See</u> <u>Jacobson</u>, 503 U.S. at 551-52.  Cromitie did what he was induced to do, and seemed happy doing it, but that cannot suffice; otherwise the induced act would always evidence the predisposition to do it.  All of Cromitie's statements listed in the majority's opinion, Maj. Op. 39-40, regarding specifics of the attack--such as targets--were made in direct response to Hussain's badgering Cromitie to form a design or make a plan.  For example, Cromitie's statement about "hit[ting] the bridge" was a direct response to Hussain's asking "[w]hat is the, what, I mean, in your mind, were your best targets here?  In New York?"  And Cromitie's statement about "get[ting] a synagogue" occurred later in that same conversation and context.  These statements, which occurred months after the first meeting in June 2008, cannot be used to prove predisposition under <u>Jacobson</u>.  Hussain's

7

industrious labor to convince Cromitie to join a terrorist plot--including Hussain's exploitation of Cromitie's "love" of and respect for Hussain and Hussain's offers of large sums of money to the impoverished Cromitie--colors these statements, along with many others cited by the majority[3]; they show the government's successful inducement, not Cromitie's predisposition.

No reasonable jury weighing only the evidence of predisposition admissible under <u>Jacobson</u> could conclude that Cromitie had an "already formed design" to commit an act of terror. Wanting to "die like a martyr" and "do something to America" is not a formed design, and certainly not "preparation," <u>Sherman</u>, 200 F.2d at 882. These are wishes, not designs. One amounts to no more than the boastful piety of a foolish man; the other could be banter in any faculty lounge.

It is clear that Cromitie in his unmolested state of grievance would (for all the evidence shows, and as the district court found) have continued to stew in his rage and

---

[3] For instance, Cromitie's statement regarding Allah giving him his "own will," and "if I'm doing something, it's because I wanted to do that for so long," Maj. Op. 40-41, were made during a long conversation in February 2009, months after Hussain's concerted inducement had begun. During that same conversation, Hussain pushed Cromitie to scout targets and recruit other members from the mosque.

ignorance indefinitely, and had no formed design about what to do. The government agent supplied a design and gave it form, so that the agent rather than the defendant inspired the crime, provoked it, planned it, financed it, equipped it, and furnished the time and targets. He had to, because Cromitie was comically incompetent, possibly the last candidate one would pick as the agent of a conspiracy.[4] There simply was no evidence of predisposition under our settled definition of that term.

I would therefore reverse Cromitie's conviction as the product of entrapment. At the same time, I agree with the majority that the other defendants were not entrapped, and I therefore concur in the affirmance of their convictions.[5]

---

[4] En route to the terror site, the government agent directed Cromitie to assemble the bombs; but he couldn't figure it out, and had to be shown how to do it. At the site, the government agent directed him to hide the bombs in the trunk of the car; but he couldn't get the trunk open, so he put them in the back seat. The government agent then directed him to arm the bombs, but as they drove away from the supposed car-bomb parked in front of the synagogue, Cromitie exclaimed "holy s***, I forgot to turn it on."

The majority opinion argues that competence is not a consideration in the entrapment defense. I agree, up to a point; but Cromitie's bumbling compelled the exasperated government agent to treat him as a puppet. Certainly, it shows how little danger Cromitie posed to the community.

[5] As the majority points out, the district court has conscientiously demonstrated with telling circumstantial evidence that each defendant (other that Cromitie) readily responded to Cromitie's offer to join the plot. I would affirm based on the district court's reasoning.