Judge TORRES concurs in the judgment in a separate opinion.
DEBRA ANN LIVINGSTON, Circuit Judge:
This is an appeal by three individuals— Akeem Monsalvatge, Edward Byam, and Derrick Dunkley — convicted after a jury trial of committing two armed bank robberies, in violation of 18 U.S.C. § 1951(a), two counts of unlawful use of a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(l)(A)(ii), and conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a). On April 10, 2014, the district court (Dearie, J.) sentenced each of the three Defendant-Appellants principally to thirty-two years of imprisonment.
On appeal, Monsalvatge, Byam, and Dunkley raise a variety of claims. This opinion considers one of Monsalvatge’s *485 claims, which Dunkley joins: whether the district court abused its discretion in admitting into evidence at trial four clips (lasting a total of one minute and sixteen seconds) from the 2010 film, The Town. A summary order filed in connection with this opinion addresses the balance of the Defendant-Appellants’ claims on appeal. For the reasons stated below and in that summary order, we AFFIRM the judgments of conviction as to Monsalvatge anfi Byam; and we AFFIRM Counts One, Four, and Five and REVERSE Counts Two and Three of the judgment of conviction as to Dunkley. We remand for resen-tencing as to Dunkley.
BACKGROUND
I. Factual Background[1]
Monsalvatge, Byam and Dunkley were convicted after a jury trial of committing armed robberies of two Pay-O-Matic check-cashing stores and of conspiring to commit these crimes. As set forth below, the two robberies differed in their modus ’ operandi. In the first robbery, on February 24, 2010, three bandana-covered men, wielding guns, stole $44,039.73 from a Pay-O-Matic located at 160-30 Rockaway Boulevard in Queens, New York, with one of the robbers gaining access to the protected area of the store by descending through the roof. In the second robbery, on February 14, 2012, almost two years later, three robbers stole $200,755.89 at gunpoint from a Pay-O-Matic located at 247-12 South Conduit Avenue, also in Queens, New York. This time, however, the robbers did not wear bandanas, but rather police-uniform disguises and lifelike “special-effects” masks, and they accosted an employee in gaining access to the store. And unlike in the first robbery, so as to remove any fingerprints or DNA, one of the robbers poured bleach on the teller counter. At trial, the Government played three of four The Town movie clips admitted by the district court (lasting a total of one minute and seven seconds) for the jury. The Government argued that Monsalvatge was familiar with The Toum and admired it, and that the co-conspirators altered their mo-dus operandi to carry out the second robbery in a manner resembling robberies depicted in the movie.
A. The February 24, 2010 Robbery
The first Pay-O-Matic robbery occurred in the early morning hours of February 24, 2010.[2] That morning, Muhammed Hafeez was working as the cashier at the Pay-O-Matic. His workspace, the cashier area, was separated from the counter by a bulletproof-glass divider and two locked doors. Hafeez left to use the restroom, which was located at the back of the store, still behind the secure cashier area. While he was in the bathroom, he heard a crash.
Upon leaving the restroom to investigate the disturbance, Hafeez saw a robber (“Robber 1”) holding a gun and standing in the secure cashier area. The crash Hafeez heard occurred when the robber gained entry to the store’s secure area by descending through an air duct that had been pried open on the store’s roof, leaving a large hole in the store’s ceiling. The robber wore a black hooded sweatshirt with jeans; his face was covered with a black bandana; and he wore blue gloves with white text. The robber aimed his gun at Hafeez, di *486 rected him to lie on the floor face down, and handcuffed him.[3]
A second robber (“Robber 2”) appeared on the scene in the customer area of the store. Robber 2 also wore jeans and had his face covered but, unlike Robber 1, he wore an orange construction vest with yellow stripes over a blue jacket. In order to confer with Robber 2, Robber 1 left the secure cashier area of the store, with the door locking behind him and leaving Haf-eez by himself. The robbers, realizing they were now locked out of the secure cashier area, demanded that Hafeez open the door. Hafeez refused. The robbers attempted to force open the door but failed. At that point, Robber 1 left the store. Robber 2 stayed behind, pointing the gun at Hafeez through the window while making calls on his cell phone.[4]
Robber 1 crashed through the ceiling again, gaining entry to the cashier area. He removed the money from the cashier’s drawers and put it in his bag. Robber 2 continued to use his cell phone. At that point, Robber 1 asked Hafeez to open the safe. Hafeez responded that he did not know the combination to the safe. The scene turned violent. Robber 1 began to beat Hafeez with a metal chair. Robber 2 attempted to pass a gun to Robber 1 through a slot in the teller window, but the slot was not wide enough to allow the gun to pass from the customer area, where Robber 2 stood, to the cashier area, where Robber 1 stood. Robber 2 made another phone call.
Soon, a third robber (“Robber 3”) entered the store. Robber 3’s appearance was not clearly captured on the surveillance footage. He wore dark clothing, a dark jacket, and dark pants. In the store lobby, Robber 3, who had a gun, switched his weapon with Robber 2. Robber 2 handed the apparently slimmer gun to Robber 1 through the slot in the teller window. Robber 3 left the store.
Robber 1, now again armed, questioned Hafeez about the safe, asking him who would know the combination if not him. When Hafeez told Robber 1 that his supervisor had the combination, Robber 1 demanded that Hafeez call the supervisor, which Hafeez did. Hafeez’s supervisor, however, would not give Hafeez the combination to the safe. After that unsuccessful call, Robber 1 threw Hafeez’s cell phone into one of the drawers. Robber 1 told Hafeez to move to the restroom. While Hafeez was in the bathroom, Robber 1 left the store using the emergency exit, and Robber 2 left through the front door. The robbers absconded with $44,039.73.
B. The February 14, 2012 Robbery
As already noted, the second robbery occurred almost two years later, on February 14, 2012, also at a Queens Pay-O-Matic.[5] At 7:56 a.m., a black Ford Explorer SUV pulled into the parking lot of the Pay-O-Matic check-cashing store on South Conduit Avenue in Queens. What appeared to be a bag covered a damaged right rear *487 window of the SUV, which also bore a distinctive dent on the front passenger side of its bumper. Fifteen minutes later, just past eight o’clock in the morning, Lil-outie Ramnanan, a teller at the Pay-O-Matic, drove her car into the parking lot. Ramnanan saw three people in the SUV. As Ramnanan walked toward the store and passed the vehicle, the three stepped out of the car.
They appeared to be white- or light-skinned men. All three men, however, also appeared to have brown lips. Ramnanan assumed they were law enforcement officials because they wore police attire: blue police jackets with hoods (bearing the police shield on the left side of the chest), police badges, and sunglasses. Two men wore baseball caps, but one did not — the third who did not wear a baseball cap appeared to be a bald man with-a goatee.[6]
The goateed man suddenly approached Ramnanan, stopped her, and asked whether she worked at Pay-O-Matic. Ramnanan responded that she did. At that point, he pulled out three papers with photographs of houses on them. According to Ramna-nan, he. showed her one of the photographs, and asked whether she “kn[ew] this photo of this house.” Joint App’x 701. She answered, yes, recognizing the house in the photograph as her own.[7] He then asked her who was inside the store and Ramnanan realized, “this is a hold up.” Id.
The goateed man directed Ramnanan to walk inside the store. Inside, there were two other people: a customer and the outgoing overnight teller named Sean Anderson. Anderson stood in a secured teller area. That area was protected by bulletproof glass and separated from the lobby by two doors that could be unlocked only from the teller area. Anderson noticed that the men wore gloves and that one of the pairs of gloves was blue with white text. The goateed man, upon entering the store, demanded that Anderson open the door. Anderson obliged, and the goateed man directed Ramnanan along with the two other robbers inside that space.
Inside the teller area, one robber emptied a safe and put the money into a black bag. The other robber demanded at gunpoint that Anderson and Ramnanan lie down on the floor. The armed robber emptied the teller drawers and splashed the teller counter with a liquid that smelled like bleach.[8] The three robbers then left the Pay-O-Matic with the cash, driving off in the SUV.[9] In total, the robbers stole $200,755.89.
*488 Bank records showed that thousands of dollars of cash were deposited into Dunk-ley’s account shortly after the February 14, 2012 robbery. Monsalvatge opened a new account on February 15, and shortly thereafter made several large cash deposits. Within months, Monsalvatge and Byam also took a trip to Cancún. Records show, and employees from various luxury goods retailers testified, that each of the defendants spent thousands of dollars on high-end goods during the spring and summer of 2012.
[[Image here]]
On August 21, 2012, Monsalvatge was arrested pursuant to an arrest warrant.[10] Shortly thereafter, Byam, while in his apartment, was also arrested pursuant to a warrant. Upon arrival, the arresting officers brought Byam into the apartment building hallway and proceeded to conduct a protective sweep of the apartment.[11] The next day, Derrick Dunkley purchased a bus ticket from New York City to Hartford, Connecticut. Approximately one month later, law enforcement officers located and arrested Dunkley at his aunt’s house in Hartford.[12]
II. Procedural History
On January 4, 2013, a grand jury indicted Monsalvatge, Byam, and Dunkley, charging each of them with Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a) (Count One); Hobbs Act robbery on February 24, 2010, in violation of 18 U.S.C § 1951(a) (Count Two); unlawful use of a firearm in a crime of violence in connection with the February 24, 2010 robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Count Three); Hobbs Act robbery on February 14, 2012, in violation of 18 U.S.C § 1951(a) (Count Four); and unlawful use of a firearm in a crime of violence in connection with the February 14, 2012 robbery, in violation of 18 U.S.C. § 924(c)(l)(A)(ii) (Count Five).
*489 A. Pre-Trial Proceedings
The district court considered a number of motions in advance of trial. As relevant here, the Government filed a motion in limine concerning The Town, a 2010 crime drama about a group of Boston bank robbers.[13] The robberies in the film bore certain similarities to the charged 2012 robbery, and the Government had evidence that at least one of the defendants had seen and admired the film. In its motion, the Government requested to play for the jury at trial film clips from The Town. These clips would serve “as evidence regarding the genesis of the defendants’ mo-dus operandi in the 2012 robbery and to explain the change in modus operandi between robberies committed in 2010 and 2012.” Joint App’x 406.
The first clip (“Clip 1”) is nine seconds long. See Gov’t Ex. 79 (Clip 1). It begins by showing two investigators outside a Harvard Square bank that has been robbed. They both wear navy-blue jackets, one with a hood. One, in bold letters, reads “POLICE” on the back, while the other reads “FBI.” The labels “POLICE” and “FBI” appear in smaller letters on the front, left sides of the jackets as well. As they enter the crime scene, the police investigator tells the FBI agent that the perpetrators had “bleached the entire place for DNÁ,” which “kills all the clothing fibers so [the investigators] can’t get a match.” Id. at 0:05-0:09.
The second clip (“Clip 2”) is nine seconds long. See Gov’t Ex. 79 (Clip 2). There are a number of robbers — four, it seems— who wear black hooded sweatshirts and elaborate masks. The masks depict blue skulls with hanging blue dreadlocks. For one second, one of the robbers is shown to be holding an assault rifle[14] — but only the butt of the gun appears, because the rest of it is cropped at the bottom of the frame. Id. at 0:01. The mise-en-scene is difficult to absorb in nine seconds, but the mood is tense: in the midst of the robbery, the perpetrators realize there are people gathering outside the bank doors. One robber says, “We gotta go.” Id. Another yells, “Let’s go!” Id. at 0:02. For two seconds, the robber holding the weapon runs across the frame — the firearm is visible, but blurred by the movement. A robber yells, “Let’s bleach it up! Let’s bleach it up!” Id. at 0:04-0:06. The robbers then pour bleach on the bank teller’s counter as the clip ends.
The third clip (“Clip 3”) is twenty-one seconds long. See Gov’t Ex. 79 (Clip 3). The scene opens with a closely framed image of one of the robbers, played by Ben Affleck, who appears stern. He is sitting in the second row of a van with the other robbers as they drive through the North End neighborhood of Boston. They are on their way to commit a robbery. A police scanner discloses the location of the authorities to the robbers. The driver advises the rest of the group, “Say your prayers; here we go.” Id. at 0:08-0:09. At that point, the robbers, beginning with Affleck’s character, put on masks which disguise them as elderly nuns. These masks show exces *490 sively wrinkled, sagging skin. The masks have holes for the robbers’ real eyes and mouths — through which the audience can see a bit of the robbers’ actual skin. For the final four seconds of the clip, the audience sees a robber through the van’s window. The robber is now masked as an older nun and holding an assault rifle. Only the top half of the weapon is visible.
The fourth and final clip (“Clip 4”) is thirty-seven seconds long. See Gov’t Ex. 79 (Clip 4). This scene shows one of the robbers dressed as a police officer, knocking on the door of the “cash room” at Fenway Park. He wears a dark-blue jacket (bearing the police department crest on the shoulder), a cap, a face scarf or bandana, and sunglasses. On the left side of the front of the jacket, the robber wears a police badge. He knocks on the locked door of the secured cash room. He reveals to the employees on the other side that he knows their home addresses and family members’ names, and that there are “men outside [their] homes.” Id. at 0:28-0:31. Their wives, the robber advises, would want them to open the door. They do so, and the robber walks through the threshold pointing a handgun.
The Government sought to admit the film clips as relevant because, given the similarities between the actions depicted in these scenes and the February 2012 robbery, the clips helped to explain why the 2010 and 2012 robberies had proceeded differently. The similarities included: (1) pouring bleach on the bank surfaces; (2) threatening an employee by revealing knowledge of the employee’s home address; (3) wearing police badges, uniforms, and sunglasses; and (4) wearing masks. In connection Adth its motion, the Government submitted an iPhone photograph that showed Monsalvatge standing next to Byam and wearing a t-shirt with a silk-screened image of one of the masked robbers from Clip 3 of The Town. The Government also included text messages showing that Monsalvatge had designed and custom-ordered the t-shirt at a mall.[15] Dunkley and Byam each raised a Federal Rule of Evidence 403 objection in their papers opposing the Government’s motion in limine. The district court granted the Government’s motion to admit the evidence. In doing so, the district court explained that it had “looked at the clips” and noted that Monsalvatge had “a T-shirt ... depicting a particular still scene from th[e] movie.” Joint App’x 643. On that basis, the district court “understood]” the Government’s theory and granted the motion. Id.
B. Trial Proceedings
The trial began on July 30, 2013. As part of the extensive proof at trial, which included both surveillance footage of the two robberies and testimony from Hafeez, Ramnanan, and Anderson, the Government introduced evidence that all three defendants had frequented Pay-O-Matic cash-checking stores during the period of the alleged conspiracy and that each defendant’s cell phone records showed a flurry of communications among the defendants surrounding each of the robberies.[16] Monsalvatge’s cell ■ phone also contained photographs and incriminating text messages among the three defendants.[17]
*491 Specifically as to the February 24, 2010 robbery, the Government introduced forensic evidence showing that Monsal-vatge’s DNA was found on the handcuffs used on Hafeez. Specifically as to the February 14, 2012 robbery, the Government adduced testimony from digital retailers and manufacturers regarding the defendants’ purchase of law enforcement paraphernalia and lifelike masks worn during the robbery.[18]
At trial, the Government introduced the four clips from The Toim into evidence, which the district court admitted over objections by all three defendants. The Government then played three of the four clips for the jury. Before playing the clips, the district court provided an instruction to the jury: “Folks, this is a movie, all right. It’s make believe. Anything that you hear on this movie is not before you for the truth of it. This is Hollywood and not Brooklyn federal court, so we’ll leave it at that for the time being.” Joint App’x 1075. A Government witness, an investigating detective, highlighted aspects of the clips as they were played for the jury.
The Government began by playing Clip 2 — the nine-second-long excerpt depicting the robbers pouring bleach on the counter — for the jury. After playing the clip, the witness described the clip as showing “the perpetrators robbing a bank and in th[e] container it contained bleach and they are pouring it by the drawers and the teller area where they possibly touched.” Id. at 1076.
Next, the Government played Clip 4 for the jury. This thirty-seven-seeond-long excerpt showed, as the witness testified, a perpetrator dressed as a police officer revealing to the employees that he knew personal details about their lives. The witness explained that the character “knew *492 [the employees’] routines, he knew who their family were. He basically threatened them if they were going to make a distress call, that their family would get called.” Id. at 1077.
Last, the Government played Clip 3 for the jury. This twenty-one-second-long clip showed the robbers in a van with two of them putting on a lifelike mask as part of a nun disguise. In conjunction with this clip, the Government introduced into evidence the photograph of Monsalvatge wearing a t-shirt that depicted the image from that scene: the robber wearing the lifelike nun mask. Byam is standing next to Monsal-vatge in the photograph. The Government later introduced into evidence text messages indicating that Monsalvatge had custom-ordered the t-shirt at a mall.
In total, the Government played one minute and seven seconds of The Town for the jury. The next day, the Government requested that the district court provide the jurors an additional instruction regarding the movie clips. It asked that the district court instruct the jury that “there were [no] actual people outside of ... Ramnanan’s home as was stated in the film and that the weapons that were used in the particular robbery shown in the clip were large assault-like weapons. And that there’s no contention here that those types of weapons were used in the robbery.” Id. at 1230. The robbers on trial, the Government explained, used semiautomatic pistols. The Government sought this additional instruction “[j]ust for the sake of making sure that there’s no confusion.” Id. Later that day, the district court provided the additional instruction the Government had requested:
[L]et me take you back to yesterday for just a moment. You will recall, I think it was yesterday, you saw clips from a movie. The movie is entitled ... “The Town.” During those clips you may have noticed that actors were using these very flerce-looking assault weapons. There is no evidence in this case nor is there an allegation in this case that-such weapons were used; I want to make sure you understand that. There is also a scene that you may have noticed where the claim was that the perpetrators of the crime had somebody outside the house of some of the victims during the course of the crime; again, no such allegation in this case, and you’ll hear no proof to that effect in this case. I just want to make sure there is no misunderstanding.
Id. at 1307.
With that, the film clips were not mentioned again until summations, when the Government described for the jury the different techniques the robbers had used in the second robbery and stated, “we have an idea where they got those techniques.” • Id. at 2426. The Government explained:
You saw clips from a movie, The Town. You saw criminals being portrayed in that movie pouring bleach on surfaces to destroy DNA, using police uniforms, using a knowledge of victim’s homes to make sure that people would do what they wanted them to do. In one of those clips you hear a police scanner, so they can keep track of whether law enforcement is responding.
Now, we know the defendants knew about that movie. Akeem Monsalvatge had a shirt depicting one of the scenes we watched, a shirt that he had made, an inside joke. But how did the techniques line up? They used bleach during their robbery. You recall the video, one of them clearing out the cash drawers and pouring the bleach from a bottle he had brought with him. We know it was bleach. The victim said it smelled like bleach. When it got on their clothing it created white spots.
*493 And we saw this text message yesterday, from Edward Byam to Akeem Monsalvatge, they taking DNA for misdemeanors now, shit crazy. Then the response, that bleach, it’s N-I-G-G-A-S best friend. Keep in mind when Akeem Monsalvatge was sending that text message he had already been arrested for the 2010 robbery. He had already been told that his DNA was found at the scene. He certainly thinks bleach would be his best friend.
What about the police uniforms? Yeah, they did that too. Knowledge of a victim’s home, a threat that everyone would understand, they know where I live. What about the police scanner? You can see it here in his hands. And you can see it here in Government Exhibit 62, seized from Akeem Monsalvatge, and when it was seized what station was it set to, fire and police.
Id. at 2426-28.
During Monsalvatge’s summation, his counsel sought to diffuse the Government’s theory that The Toim accounted for the robbers’ change in modus operandi. He told the jury that “[w]hen you look at the February 24th, 2010 robber, it’s like the Three Stooges, these guys don’t know what they are doing, they get locked out. They are coming through the ceiling twice.... And they are saying these three guys, that’s the team from 2010.” Id. at 497. By contrast, the February 24, 2012 robbers appeared to be a “well[-]oiled machine,” escaping in three minutes with more than $200,000. Id. Incredulously, he concluded, “But you know what the key is, the key is they saw the movie The Town, so they got it all right.”[19] Id. at 2498.
The district court proceeded to charge the jury. After deliberations,. the jury returned guilty verdicts against each of the three defendants on all five counts. On April 4, 2014, the district court sentenced each defendant to thirty-two years of imprisonment, five years of supervised release, $240,795.62 in restitution, and a $500 special assessment.
DISCUSSION
We review a district court’s evi-dentiary rulings over objection for abuse of discretion. United States v. Cuti, 720 F.3d 453, 457 (2d Cir. 2013). We review such rulings deferentially, “mindful of [a district court’s] superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice.” United States v. Abu-Jihaad, 630 F.3d 102, 131 (2d Cir. 2010); see also 11 Wright & Miller, Federal Practice and Procedure § 2885 (3d ed. 1998) (describing a district court’s “wide and flexible[ ] discretion” in “questions of admissibility of evidence”). Indeed, “[w]e will reverse an evidentiary ruling only for ‘abuse of discretion,’ which we will identify only if the ruling was ‘arbitrary and irrational.’ ” Abu-Jihaad, 630 F.3d at 131 (citation omitted) (quoting United States v. Dhinsa, 243 F.3d 635, 649 (2d Cir. 2001)).
At issue here is the district court’s admission of the movie clips from The Town into evidence. On appeal, Monsalvatge, joined by Dunkley, contends that the dis *494 trict court abused its discretion in admitting these clips into evidence and allowing the Government to play three of them— lasting a total of one minute and seven seconds — for the jury. For the following reasons, we disagree.
[[Image here]]
Evidence is relevant if “it has any tendency to make. a fact more or less probable than it would be without the evidence” and if “the fact is of consequence in determining the action.” Fed. R. Evid. 401; see also Abu-Jihaad, 630 F.3d at 131. “Evidence need not be conclusive in order to be relevant.” United States v. Schultz, 333 F.3d 393, 416 (2d Cir. 2003) (quoting Contemporary Mission v. Famous Music Corp., 557 F.2d 918, 927 (2d Cir. 1977)). A district court “may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.” Fed. R. Evid. 403. But in reviewing a district court’s Rule 403 ruling, we “generally maximiz[e] [the evidence’s] probative value and minimiz[e] its prejudicial value.” United States v. LaFlam, 369 F.3d 153, 155 (2d Cir. 2004) (per curiam) (first and third alterations in original) (quoting United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002)).
Here, the district court properly concluded that the clips were, indeed, relevant under Federal Rule of Evidence 401. See Schultz, 333 F.3d at 416 (noting that “[determinations of relevance are entrusted to the sound discretion of the trial judge”). The clips, in conjunction with other evidence, tended to make more probable the factual inference that the 2010 and 2012 robberies (which otherwise bore few similarities in modus operandi beyond the number of robbers and the choice of targets) were part of the same conspiracy. The 2010 robbery, as Dunkley’s counsel pointed out, was clumsily committed by a “bumbling pack of robbers” who gained entry to the Pay-O-Matie by descending through the ceiling. Joint App’x 2526. In contrast, the 2012 robbery was swiftly and efficiently executed in a matter of minutes by robbers who accosted a store employee. More importantly, the second robbery bore a different set of characteristics: namely, the use of disguises — police uniforms — and lifelike special-effects masks, along with bleach to ensure the robbers left behind no trace of DNA. The The Town clips (along with evidence that at least Monsalvatge and Byam were aware of the movie and that Monsalvatge admired it sufficiently to have a t-shirt specially made to depict a The Town-scene) helped to show that the defendants’ modus operandi changed because they decided to incorporate ideas from the movie into then-method for committing robberies.
In February 2010, when the first robbery occurred, The Town was still seven months away from its wide-release date. But, by the second robbery in February 2012, the film had long been available to the public. The 2012 robbery bears a remarkable — even obvious — resemblance to multiple aspects of the clips from The Town. In fact, nearly every distinctive aspect of the 2012 robbery can be traced to the film. The robbers’ disguises, with minor differences, appear to combine the navy-blue police jacket with a hood and text detail on the front left side of the jacket in Clip 1 and the sunglasses and badge in Clip 4. The idea for special-effects masks imitating real skin is in Clip 3. The idea to use bleach to eliminate traces of DNA is in Clip 2 (and the effects of using bleach are explained in Clip 1). Threatening an employee by revealing knowledge of a home address is in Clip 4. That is every key facet of the 2012 robbery. Taken indi *495 vidually, each of these elements might not be sufficiently distinctive to raise a connection to the film. But taken together, as they occurred here, the attributes of the 2012 robbery are clearly connected to the film.
. Government Exhibits 99 and 120 make that connection even sharper. The Government submitted an iPhone photograph that showed Monsalvatge standing next to Byam and wearing a t-shirt with a silk-screened image of one of the masked robbers from The Town — specifically, a still frame of the nun-costumed robber in Clip 3. See Gov’t Ex. 99. And this was not an ordinary t-shirt that a fan might purchase at a retail store. Rather, the Government also introduced evidence to show that Monsalvatge designed and custom-ordered this t-shirt. See Gov’t Ex. 120. This would have been a distinctive sartorial choice for Monsalvatge at the time. The Government adduced testimony at trial from employees of luxury good retailers — including Fendi, Gucci, Ralph Lauren, Christian Louboutin, and Louis Vuitton — that the defendants spent thousands of dollars at these stores during the spring and summer of 2012. Despite this apparent taste for haute couture, Monsalvatge, in March 2012, approximately five weeks after the second robbery, went to the mall and custom-ordered a t-shirt depicting a scene from The Toim. He later posed with Byam for a photo wearing that shirt.
Monsalvatge states, in conclusory fashion, that the clips are prejudicial. But he does not show how any potential for prejudice arising from the introduction of these clips outweighed their evident probative value. Monsalvatge does not even identify any specific prejudicial potential that these clips carried beyond the fact that they “invited the jury to speculate that this was a copycat crime.” Monsal-vatge Br. 48. It is unclear — and Monsal-vatge does hot explain — what effect characterizing the robbery as a copycat crime would have on the jury.
In any event, the movie clips here do not have the sort of “strong emotional or inflammatory impact” that would “pose a risk of unfair prejudice because [they] ‘tend[ ] to distract’ the jury from the issues in the case and ... [might] arouse the jury’s passions to a point where they would act irrationally in reaching a verdict.” United States v. Robinson, 560 F.2d 507, 514 (2d Cir. 1977) (quoting Fed. R. Evid. 404 advisory committee note). First, they are very short. Two clips last nine seconds, one lasts twenty-one seconds, and another lasts thirty-seven seconds. They are so short because they are narrowly tailored to show only the parts of the movie that are relevant to the 2012 robbery. The clips depict no violence: the robbers do not hurt anyone on the screen. Granted, the robbers do carry assault rifles in two of the clips, but those firearms appear for a total of only seven seconds (in Clip 2, for one and two seconds, and, in Clip 3, for four seconds). Further, in each instance, the weapons are either partially cropped by the frame or blurred by the action. In the little dialogue that occurs in the clips, moreover, the robbers appear to be the film’s protagonists.[20] With all this in *496 mind, it is difficult to see how these clips could “unfairly ... excite emotions against the defendant[s].” United States v. Massino, 546 F.3d 123, 133 (2d Cir. 2008) (per curiam) (quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)).
Critically, moreover, the district court took steps to minimize any potential for prejudice that might exist. First, the district court gave not one but two curative instructions. It initially instructed the jury: “Anything that you hear on this movie is not before you for the truth of it.” Joint App’x 1075. The next day, the district court further instructed the jury about two differences between the 2012 robbery and the movie clips. It explained: “There is no evidence in this case nor is there an allegation in this case that [assault weapons] were used; I want to make sure you understand that.” Id. at 1307. The district court also noted that in the film “the perpetrators of the crime had somebody outside the house of some of the victims during the course of the crime; again, no such allegation in this case, and you’ll hear no proof to that effect in this case.” Id. The district court clarified that it had provided this second instruction “to make sure there [was] no misunderstanding.” Id. As we have made clear, “[a]bsent evidence to the contrary, we must presume that juries understand and abide by a district court’s limiting instructions.” Downing, 297 F.3d at 59. There is no evidence suggesting otherwise in this case.
This Court has in the past declined to second-guess a district court’s admission of relevant video or media evidence where the evidence bears an identifiable connection to an issue or defendant in the case. See, e.g., United States v. Cromitie, 727 F.3d 194, 225 (2d Cir. 2013) (finding that a district court was “well within [its] discretion” in admitting into evidence a twenty-second-long video of a demonstration explosion set off by a bomb that was “constructed with the type and amount of material that the defendants thought was in the fake devices they were planning to use in the operation”); Abu-Jihaad, 630 F.3d at 131-35 (affirming the district court’s admittance of various website materials— including pro-jihadist videos and Osama bin Laden’s 1996 fatwa against the United States — on the theory that they were relevant to the understanding the operations at issue in the case, despite the materials’ potential to inflame a juror’s passions); United States v. Salameh, 152 F.3d 88, 111 (2d Cir. 1998) (per curiam) (affirming the district court’s ruling to admit a videotape that “showed a man driving a truck into a building that was flying an American flag” and then the building exploding because “[t]he videotape ... closely resembled the actual events at the World Trade Center and provided further evidence of motive and intent,” and the district court was within its discretion to find that this “significant probative value ... was not substantially outweighed by the danger of unfair prejudice” — namely, “[t]he sulphurous anti-American sentiments expressed in the terrorist materials[, which] no doubt threatened to prejudice the jury against the defendants”). To that end, our rulings have been in line with those of our sister circuits.[21] We see no reason to depart from *497 this precedent in the circumstances here, where the movie clips in question had real probative value and the potential for prejudice, we conclude, was slight.
[[Image here]]
In sum, the district court’s ruling to admit the movie clips from The Town into evidence was not arbitrary and irrational. The clips were relevant to the issues and defendants in the case and, importantly, they were short and narrowly tailored. Further, the district court provided not one but two curative instructions to minimize any potential for prejudice from the few differences between the clips and the 2012 robbery. It made clear — if it was not clear enough already — that the clips represented “Hollywood and not Brooklyn federal court.” Joint App’x 1075.
Our courtrooms are not movie theaters. But we cannot assume that our jurors— whom we routinely ask to pore over the violent and often grisly details of real crimes — are such delicate consumers of media that they would so easily have their passions aroused by short film clips of the sort at issue here. In this case, the district court acted well within its discretion in permitting the jury to see one minute and seven seconds of relevant Hollywood fiction during the course of a four-day criminal trial in real-life Brooklyn federal district court.
For the foregoing reasons, we AFFIRM the judgments of conviction as to Monsal-vatge and Byam. As to Dunkley, we AFFIRM as to Counts One, Four, and Five, and, for the reasons stated in the summary order filed in connection with this opinion, we REVERSE as to Counts Two and Three. The matter is remanded for resen-tencing as to Dunkley.

. The factual background presented here is derived from the testimony and evidence presented at trial. References in the form “Gov’t Ex._” herein are to the Government’s exhibits.

. A surveillance camera captured the events of the robbery, which transpired between 3:24 and 3:57 a.m. See Gov't Ex. 7; see also Gov’t Ex. 49 (surveillance video stills).

. The Government introduced evidence at trial to show that Monsalvatge’s DNA was recovered from the handcuffs used on Hafeez and left at the crime scene — evidence that contradicted Monsalvatge's statements to police and to a grand jury that he had not been in contact with handcuffs since 1996.

. At trial the Government introduced cellular telephone records that established, inter alia, that between 2:04 a.m. and 3:58 a.m. on the morning of the robbery, Monsalvatge and Byam’s cell phones exchanged more than 13 calls, all of which were routed through a cell phone tower located just one block away from the Rockaway Boulevard Pay-O-Matic.

.A surveillance camera captured the events of this robbery as well. See Gov't Ex. 4; see also Gov’t Ex. 2 (surveillance video stills).

. The Government adduced testimony at trial from the owner of a special-effects mask manufacturing company who explained that the robbers wore lifelike masks and that he had sold three such masks to Byam in October 2011.

. Surveillance footage of the robbery in progress depicted one of the robbers later dropping an item which turned out to be the photo of Ramnanan’s house. It was stamped "Wal-greens” on the back side, and bore both a store number and the date "12-3-11.” Subsequent investigation revealed that this particular Walgreens was near Byam's residence, and that a "Byam, E.,” providing a telephone number that matched Byam's, had placed the photograph order. Surveillance video from the pharmacy depicted Byam dropping something off at the photograph counter on December 3, 2011, and picking something up later that day.

. Police later recovered an empty juice bottle at the scene that still smelled of bleach. Both Ramnanan and Anderson testified that their apparel was splattered with the liquid during the crime, causing the clothing items, where splattered, to turn white.

. By checking addresses associated with Byam's family and friends, investigators later located the SUV, with both the damaged rear window and the dent, in the driveway of a house in Queens. Police officers inspected the vehicle, but the SUV was thereafter sold to a scrap yard and destroyed when police did not *488 seize it. Byam’s girlfriend testified at trial that the car was given to her by her stepfather and that Byam had keys to the car and used it. She also testified that she instructed Byam to get rid of the car after learning that police had examined it.

. Monsalvatge was driving at the time of his arrest and, from the car, the police seized a pair of work gloves, a police scanner, and Monsalvatge's cell phone.

. The police seized the following: a partially completed Pay-O-Matic employment application, which bore Byam's name and address; a black bag (believed to be a "robbery bag”) that was later found to contain a mask, walk-ie-talkies, a bottle of bleach, and photographs; and a small cloth bag that was later found to contain a BB gun.
Later, during the pre-trial proceedings, Byam moved to suppress this evidence as the fruit of an unlawful search. The district court found that the agents were lawfully in Byam’s apartment and were justified in conducting a protective sweep. The district court concluded, however, that "the protective sweep got out of hand” and suppressed all of the evidence seized from Byam’s apartment with one exception: the Pay-O-Matic application, which, the district court found, had been in plain view and was “immediately recognized by one of the agents.” Joint App’x 393-94; see also Gov’t Ex. 73.

.During a consensual search of the residence, the officers seized a laptop computer, identification cards, credit cards, a hat, safe deposit box keys, documents, and two cell ■ phones. A search of Dunldey's computer showed multiple recent Internet searches about the federal criminal justice system. Specifically, Dunkley searched for information relating to the following questions and phrases: "Does a subpoena mean you’re under arrest?”; "If evidence used in a federal court case was on your property can you be held?”; "Evidence against you on someone else’s property”; and "Process it takes to bring someone to trial for federal crime.” Joint App’x 2264-68. A search of Dunkley’s computer also uncovered a search for “NYPD jackets.” Id. at 2267.

. The Town (Warner Bros. Pictures 2010). The Town, released on September 17, 2010, is based on Chuck Hogan’s 2007 book Prince of Thieves. Ben Affleck directed, co-wrote, and starred in the film. The film grossed more than $154 million at the box office, and Jeremy Renner earned an Academy Award nomination for Best Supporting Actor for his performance.

. Both the Government and Monsalvatge characterize this weapon as an "assault rifle." We understand, however, that this is a technical term, and we do not have any authoritative source that indicates the particular kind of weapon the fictional scene seeks to invoke. Nevertheless, for ease of reference, we adopt the parties’ terminology herein.

.See Gov't Ex. 120 (text message of Mar. 30, 2012, five weeks after the second robbery) (“Imma try n make it da mall 2 day so 4 da fly t it’s black wit white sleeves. N 4 da nun white wit da black sleeves.”).

. The summary order published in connection with this opinion details the phone calls exchanged between all three phones surrounding the February 24, 2010 robbery.

. Some of the text messages between the three defendants referenced wealth and in- *491 eluded images of money and various luxury goods. Other text messages, particularly those sent in the month following the 2012 robbery, featured more incriminating language. See Joint App'x 2306 (“Start getting y’alls mind back on work and excellent execution so we can be rich forever, rich forever.”); id. at 2305 ("[Y]ou passed the steal balls tst [sic]. You have the smarts and you are open to advice. If you stay disciplined, dedicated, desire, and respect what you do, I guarantee you will be a multimillionaire by the time you are 25, fact.”); see also Gov't Ex. 122 (text messages between defendants). Particularly of note is a March 14, 2012, text message from Byam to Monsalvatge that states: ,"[T]hey taking DNA for misdemeanors now, shit crazy,” to which Monsalvatge responded, “[B]leach is a niggas best friend.” Joint App'x 2306; see also Gov’t Ex. 122.

. A retailer testified that on November 19, 2011, an online user purchased three NYPD navy-blue rain jackets that were hooded, zippered, and had an police department shield and read "NYPD” on the chest. The jackets were shipped to "Derrick Dunkley” at Dunk-ley’s residence. Another digital retailer testified that during the same month he sold three leather NYPD-style badge holders to a user who had Dunkley’s address associated with the account.
The owner of a lifelike special-effects masks manufacturing company testified that Byam had purchased three special-effects masks from his company on October 25, 2011. The masks were marketed as “Mac the Guy” masks with eyebrows, and one also had a goatee. Byam purchased the masks with a prepaid credit card, and the masks were ordered and delivered to the address of Monsal-vatge’s girlfriend, with whom Monsalvatge lived. Byam later e-mailed the manufacturer, stating that he was."extremely pleased” with the masks and asked for guidance about how to wear them.
At the Government’s request, the company manufactured a "Mac the Guy” mask to the same specifications as the goateed mask Byam ordered. The company’s owner modeled it for the jury. Significantly, the owner testified that a person’s real lips are sometimes visible when wearing the mask. Last, he testified that, when he reviewed surveillance photographs from the 2012 robbery, he could tell that one of the robbers was wearing a "Mac the Guy” mask with a goatee.

. Separately, counsel for Dunkley, in his summation, emphasized that there was no evidence that Dunkley had seen The Town. Dunkley’s counsel told the jury that the Government was ''suggesting] that this bumbling pack of robbers in 2010 all of a sudden become [sic] this incredibly sophisticated group of robbers because they have seen a movie. If that's the case, you can just watch a movie about brain surgery tomorrow and, you know, perform a flawless brain surgery on Saturday.” Joint App’x 2526. Byam's counsel in his summation claimed that the Government used the movie clips to "dress[ ] the case ... up.” Id. at 2474.

. More broadly, for anyone who saw this popular movie, the robbers in the movie are classic anti-heroes: they might break the law, but they are nevertheless the film’s protagonists and sympathetic characters. See, e.g., Anthony Lane, Actor's Dilemma: “The Town" and “Jack Goes Boating," New Yorker, Sept. 20, 2010, at 120, 120-21 ("Affleck ... plays the hero, Doug MacRay.... Affleck the movie director makes you truly, badly want his bunch of ne’er-do-wells to pull off their heists without a scratch, and you can't ask for much more than that.”); A.O. Scott, Bunker Hill to Fenway: A Crook’s Freedom Trail, N.Y. Times, *496 Sept. 16, 2010, at C2 ("The life of crime is the only one [Ben Affleck's character] knows, and he is good at what he does, but there are broad hints — well, O.K., blazing neon signs— that his heart is no longer in it.”).

. See, e.g., United States v. Schneider, 801 F.3d 186, 199-200 (3d Cir. 2015) (affirming district court’s evidentiary ruling in prosecution for traveling in foreign commerce with intent to engage in sex with a minor to admit excerpts from the film, Nijinsky, which showed a famous ballet dancer and his older patron and lover, because the victim testified that the defendant had shown him the film); *497 United States v. Smith, 749 F.3d 465, 495-96 (6th Cir.) (holding that, in a trial on mail fraud charges arising from a scheme to defraud investors, the district court did not err in admitting clips from the movie The Boiler Room that depicted salesmen deceiving potential investors, where former employees of the defendants’ company testified that the movie was provided to employees for training purposes), cert. denied, — U.S. —, 135 S.Ct. 307, 190 L.Ed.2d 223 (2014), reh'g denied, — U.S. —, 135 S.Ct. 1034, 190 L.Ed.2d 898 (2015); United States v. Jayyousi, 657 F.3d 1085, 1108 (11th Cir. 2011) (affirming the district court's ruling, in terrorism case, to admit a seven-minute-long portion of a 1997 CNN interview with Osama Bin Laden to which the alleged co-conspirators had briefly referred in intercepted phone calls); United States v. Wills, 346 F.3d 476, 489, 497 (4th Cir. 2003) (affirming the district court's ruling to admit clips from the movie Casino as relevant to help explain a reference the defendant made during a tape-recorded conversation). But cf. United States v. Gamory, 635 F.3d 480, 493-94 (11th Cir. 2011) (ruling that the district court abused its discretion in admitting into evidence a rap video in which the defendant appeared in light of its minimal probative value, that it contained inadmissible hearsay statements, and that "[t]he lyrics presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny,” but concluding that this was harmless error in any event).